**Anna Nell LANGFORD,**
**Plaintiff–Appellant,**

v.

**Gay LANE; Richard Mitchell; Overton**
**County, Tennessee,**
**Defendants–Appellees.**

No. 89–5488.

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 22, 1990.

Decided Jan. 3, 1991.

Rehearing and Rehearing En Banc
Denied Feb. 25, 1991.

Onnie L. Winebarger (argued), Byrds-town, Tenn., for plaintiff-appellant.

Darrell G. Townsend (argued), Thomas M. Pinckney, Jr., Clifford Wilson, Howell, Fisher, Branham & North, Nashville, Tenn., A.F. Officer, III, Livingston, Tenn., for defendants-appellees.

Before WELLFORD and GUY, Circuit Judges; and ENGEL, Senior Circuit Judge.

ENGEL, Senior Circuit Judge.

Anna Nell Langford appeals a summary judgment rendered against her in her suit brought under 42 U.S.C. § 1983, against her former supervisor, Gay Lane, as well as against Richard Mitchell, County Executive of Overton County, Tennessee, and against the county itself. Langford was employed as a nurse's aid at a County-owned and operated nursing home until June 4, 1987, when Lane fired her. Langford contends that she was fired in violation of her first amendment rights after speaking against Lane at a public meeting of the County Board of Commissioners. The district court granted summary judgment[1] against Langford, concluding that her speech related only to private concerns arising out of her employment and was thus not protected by the first amendment. The court also found that Lane could have fired Langford for reasons independent of her allegedly public speech.

Assuming without deciding that Langford's remarks before the Commission constituted protected speech under the first amendment, we conclude that her other and unprotected conduct in all events would inevitably have brought about her discharge for insubordination and other causes unrelated to her exercise of free speech.

## I.

In mid–1986, Langford's fifth year of employment at the nursing home, her relations with co-workers began to deteriorate. In July and August 1986, Langford by-passed her immediate supervisors and brought complaints against a fellow employee directly to Lane, the administrator of the home. Lane held a meeting with Langford, Langford's supervisors, and the other employee to settle the conflict. In September, Langford again clashed with co-workers and threatened to quit, but Lane convinced her to take a leave of absence instead.

In October or November 1986, twenty-two of Langford's co-workers signed a petition asking Lane to remove Langford from their shift. Without responding directly to the petition, Lane circulated a memo stating that such petitions violate grievance policies of the nursing home. When Langford learned of the petition a few months later, she thought that Lane should have disciplined the petitioners. Disgruntled, Langford began to tell her co-workers that Lane had "done her dirty."

In May and June 1987, there was a great deal of public controversy in the county concerning the operation of the nursing home and whether Lane should be retained as administrator. In May, the Nursing Home Committee of the County Board of Commissioners decided to terminate Lane because of personnel problems at the home. After Lane defended herself before the Commission, however, it suspended her termination and scheduled a public meeting on June 2 to allow the public to state their views on the problems at the nursing home

---

**1.** After considering affidavits and deposition evidence in response to the defendants' motion for summary judgment, the district court dismissed Langford's claim for want of subject matter jurisdiction.

and on Lane's retention. During this time, Langford showed the petition against her to one of the commissioners, and it was read to the Commission at a meeting on May 26.

The first alleged infringement of protected speech in this lawsuit occurred on June 1, the day before the public meeting, when Lane called Langford to her office and asked her "why you are against me so bad." Langford responded that "a long time ago I came to you for some help and I didn't get any and I'm not a-going to talk to you about this problem." Langford then excused herself and went back to her work station. After Langford left the office, Lane called Joe West, Chairman of the County Commission Nursing Home Committee, told him that Langford had refused to talk to her, and asked if she could fire Langford. According to West, Lane told him that she had wanted to talk to Langford about what Langford was going to say at the public meeting the next evening. West responded that not having been there, he could not make the decision what to do.

Later that evening, Lane approached Langford as she was working and asked her again to come talk about their problem. In front of other employees and patients, Langford refused. Lane told her that this was insubordination, but Langford still refused and said that Lane would learn her views at the public meeting.

After this rebuff, Lane pulled Langford's time card and left a note asking to meet with her the next day, June 2. Langford was not scheduled to work on this day. Rather than coming to the meeting, Langford called Lane to reschedule their meeting for the following day, June 3, which was also a day off for Langford. She claims that she agreed not to meet but merely to come if she could.

The second instance of allegedly protected speech occurred at the public meeting on the night of June 2. The meeting was well-attended and apparently was televised. Nursing home employees, former employees and families of patients were allowed to make statements to the Board. Lang-

ford's brief remarks were taped but apparently were never transcribed and do not appear verbatim in the record. By her account, she told the Commission about the petition against her; requested that her time card be put back in the rack; and said that she did not understand what had gone wrong and that she had always gotten along well with her immediate supervisor. She cannot remember what else she said. Others made statements to the Commission in person and in writing, including some nursing home employees who spoke against Langford. Several commissioners questioned various speakers, including Lane, about personnel matters at the home and particularly about how Langford's situation had been handled.

The next day, June 3, Langford did not come to the meeting with Lane, nor did she call to notify Lane that she would be absent. On June 4, she was scheduled to work and came in, but found that her card was still not in the rack. She left without speaking to anyone. Unknown to Langford, Lane fired her later that afternoon. For the next several days, Langford continued to come in at the beginning of her usual shift, but left promptly and without speaking to anyone when she saw that her card was still gone. She later learned that she had been fired.

Based on the June 2 public meeting, the County Commission reversed its original decision to terminate Lane and retained her on probation. Lane continued as administrator of the nursing home until she resigned one and a half years later.

After reviewing these facts, the district court below granted the defendants' motion for summary judgment. The court's opinion concluded that the employment problems involving Langford were "an internal personnel matter [at the nursing home] of no great public interest," Opinion at 5, and therefore that Langford's statement at the public meeting was not constitutionally protected speech. The court also stated that Lane could have fired Langford in the absence of her speech. We agree with this second conclusion.

## II.

At the outset of our review, we recall our obligation in a free speech case "to 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.'" *Bose Corp. v. Consumers Union of the United States, Inc.,* 466 U.S. 485, 499, 104 S.Ct. 1949, 1958, 80 L.Ed.2d 502 (1984) (quoting *New York Times v. Sullivan,* 376 U.S. 254, 285, 84 S.Ct. 710, 728, 11 L.Ed.2d 686 (1964)).

To prevail on a free speech claim, a public employee must meet the two-stage test articulated in *Mount Healthy City Bd. of Educ. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), and developed in subsequent decisions. First, the employee must establish, as a matter of law, that her speech was constitutionally protected. 429 U.S. at 287, 97 S.Ct. at 576; *see Connick v. Myers,* 461 U.S. 138, 148 n. 7, 103 S.Ct. 1684, 1690 n. 7, 75 L.Ed.2d 708 (1983). To merit this status, the speech must address a matter of public concern, and the employee's interest in making such statements must outweigh the "interest of the State, as an employer, in promoting the efficiency of the public service it performs through its employees." *Pickering v. Board of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968); *Connick,* 461 U.S. at 146–54, 103 S.Ct. at 1689–94. The second stage of the inquiry addresses causation and is an issue of fact. If the employee can prove that the protected speech was a substantial and motivating factor in the adverse employment action against her, the burden then shifts to the employer to show by a preponderance of the evidence that it would have taken the same action even in the absence of the protected conduct. *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576; *Barnes v. McDowell,* 848 F.2d 725, 733 n. 9 (6th Cir.1988).

### A. *Langford's refusal to speak to Lane*

Although the district court's opinion did not directly address this issue, it was argued in the summary judgment proceeding and is thus properly before us on appeal.

Langford contends that she had a constitutional right to refuse to tell Lane her grievances on the night before the public meeting, and that Lane violated this right by firing her for her silence. This claim of protected speech by a public employee is governed by the first amendment principles discussed above, as well as several further principles. The protection of the first amendment extends equally to "the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard,* 430 U.S. 705, 714, 97 S.Ct. 1428, 1435, 51 L.Ed.2d 752 (1977). The free speech rights of a public employee under the *Connick* framework include the right to refrain from speaking. *Sykes v. McDowell,* 786 F.2d 1098, 1104 (11th Cir.1986). There, the court held that "[a] public employee who positively asserts the right not to speak when ordered to support his employer [politically] is within the protection of the first amendment." *Id.*

### 1. Matter of Public Concern

Whether Langford's silence addressed a matter of public concern "must be determined by the content, form, and context of the given statement, as revealed by the whole record." *Connick,* 461 U.S. at 147–48, 103 S.Ct. at 1690–91, *quoted in Rankin v. McPherson,* 483 U.S. 378, 385, 107 S.Ct. 2891, 2897, 97 L.Ed.2d 315 (1987); *Matulin v. Village of Lodi,* 862 F.2d 609, 612 (6th Cir.1988). *Connick* concerned a survey circulated by a disgruntled public employee among her co-workers, seeking their view on internal office policies. The Supreme Court held that all but one of the survey questions were "mere extensions" of her dispute with her superiors. 461 U.S. at 148, 103 S.Ct. at 1690. The Court noted that the "focus of [the employee's] questions is not to evaluate the performance of the office.... The questions reflect one employee's dissatisfaction ... and an attempt to turn that displeasure into a cause celebre." *Id.* As for a survey question about improper political pressures in the office, however, the Court held that it addressed "a matter of interest to the community upon which it is essential that pub-

lic employees be able to speak out freely without fear of retaliatory dismissal." 461 U.S. at 149, 103 S.Ct. at 1691.

Construing the evidence in Langford's favor, we assume that her silence was based on her intention to speak against Lane's alleged maladministration at the public meeting. Although the district court held that her public speech concerned only an internal employment matter and was of no public concern "in the constitutional sense," we will assume to the contrary that the speech was of public concern notwithstanding that it addressed an employment matter ordinarily of no concern outside the workplace.

Actually, so far as we can ascertain, the complaints purportedly expressed, and intended to be expressed by Langford appear to relate exclusively to her personal job-related problems, and are like those found in *Connick* insofar as they reflected her personal dissatisfaction and an evident effort to turn that into a cause celebre. As such, *Connick* holds they would normally be outside the purview of first amendment protection. To this extent, at least, the trial judge's observation that Langford's statements would normally be of little if any public concern seems correct. We hesitate to affirm flatly on this basis, however, because the record clearly shows that a public issue had arisen concerning Lane's job performance and had assumed such proportions as to persuade the Commission to hold public hearings on the matter. Thus, at least arguably, matters which might ordinarily be purely internal administrative problems also possessed an element of public interest in which public comment was solicited and deemed relevant by the Commission to a policy and personnel decision within the area of its responsibility. For this reason alone, we hesitate to bring down the curtain on Langford's appearances before the Commission or on Lane's efforts to dissuade her from appearing. Under such circumstances we prefer to err, if at all, on the side of free public expression. In this light, we must assume that Langford's dispute and Lane's handling of it had become a matter of public concern.

### 2. The Balancing Test

■ Assuming, therefore, that Langford's comment before the Commission involved a matter of public concern, the next step in the constitutional inquiry is to determine whether Langford's interest in not discussing the same subject outweighed her employer's interest " 'in promoting the efficiency of the public services it performs through its employees.' " *Rankin*, 483 U.S. at 384, 107 S.Ct. at 2896 (quoting *Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734); *Matulin*, 862 F.2d at 612. In *Barnes v. McDowell*, we applied the "balance of interest" test where a public employee claimed that he had been discharged in retaliation for criticizing certain practices within his workplace. While the panel in *Barnes* ultimately determined that the speech involved was not a matter of public concern, it did so only after carefully laying out the factors which it conceived to be involved in the balance of interests under *Connick*:

> [Relevant factors] ... include the manner, time, and place of the employee's expression in the context in which the dispute arose. Also relevant is whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise. *Rankin*, 483 U.S. at 388 [107 S.Ct. at 2899]. The balancing analysis is part of the "ultimate issue [of law]—whether the speech is protected." *See Rankin*, 483 U.S. at 386 n. 9, 388–89, 107 S.Ct. at 2898 n. 9, 2899–2900.

*Barnes*, 848 F.2d at 733 n. 9. Also, while we will not accept uncritically a public employer's assertion of disruption in the work place, *see Matulin*, 862 F.2d at 614, we are particularly mindful of two of the Supreme Court's teachings in *Connick*. First, an employer need not wait until such harm actually occurs before taking action. 461 U.S. at 152, 103 S.Ct. at 1692. Second, "[w]hen employee's speech concerning office policy arises from an employment dis-

pute concerning the very application of that policy to the speaker, additional weight must be given to the supervisor's view that the employee has threatened the authority of the employer to run the office." 461 U.S. at 153, 103 S.Ct. at 1693.

In *Connick*, the relevant question was whether the employee's interest in formally surveying her co-workers' views on political pressure from superiors outweighed her employer's managerial interests in controlling the consequent disruption. The Court held that the balance favored the employer. In so concluding, the Court noted that the survey questions about the trustworthiness of superiors "carried a clear potential for undermining office relations," 461 U.S. at 152, 103 S.Ct. at 1692, which were unquestionably important to the proper functioning of a prosecutor's office. Also significant were the facts that Myers had prepared and distributed her survey at the office during work hours, and that the survey stemmed from a personal conflict between Myers and her employer. 461 U.S. at 152–54, 103 S.Ct. at 1692–94.

Guided by the analysis in *Connick*, the balance goes against Langford. Her voiced grievances against Lane, originally a purely intraoffice matter, were clearly of legitimate and serious concern to Lane in her responsibilities as administrator of the nursing home. The grievances were no less so after they became a matter of public interest as well. When an employee has complained to co-workers that their manager has "done her dirty," the manager obviously has a legitimate interest in resolving the problem. Langford's refusals to discuss her rancor with Lane, once in front of other employees and patients, directly threatened Lane's authority and employee discipline and "support[ed her] fears that the functioning of [the facility] was endangered." *Connick*, 461 U.S. at 153, 103 S.Ct. at 1693.[2] Lane could reasonably have viewed Langford's actions as a threat to the positive and pleasant atmosphere desirable in a nursing home. Most importantly,

nothing in the evidence indicates that Lane sought to coerce or intimidate Langford from speaking at the impending public meeting. It is undisputed that Lane asked Langford only "why are you against me so bad" and "to talk ... about this problem." Aside from the simple fact of the timing of the meeting, Langford has submitted no evidence to support her allegation that Lane's sole purpose was to inhibit her impending statement before the County Commission. Instead, Langford agrees that Lane merely asked her to explain her hostility, and after being rebuffed a second time, told Langford that "this may be insubordination." Nothing in these remarks could reasonably be understood to justify Langford's belief that the purpose of the meeting was not to discuss a serious employee-management conflict which Lane had the authority and the responsibility to address.

Contrary to Langford's contention, *Sykes* is inapposite to the present case. The employee in that case refused to give political support to his superior's reelection campaign, a matter of no legitimate interest in a public office at that level. For the employee to have "spoken" thus at all would have surrendered his constitutional right. 786 F.2d at 1104. Here, the employee refused to speak with her superior regarding a legitimate work-related matter which also touched on an issue of public concern. Even though she might have intended to politicize the battle by carrying it to the Commission, Langford had no right on that account to refuse to discuss matters relating to her own employment with Lane. Her own statements asserting that she did not know what had gone wrong reinforce the utter foolishness of her refusal to communicate at work with Lane.

B. *Was Langford fired because of her public speech?*

■ While Langford's refusal to speak to Lane was not protected speech, we will continue to assume that her statement at

---

**2.** To the extent that the district court's discussion of Langford's "rank insubordination," Opinion at 680, refers to Langford's refusals to speak with Lane, as opposed to the public speech, we agree.

the public meeting was. We therefore proceed to the causation prong of the *Mount Healthy* analysis.

In *Matulin*, we held in accordance with *Mount Healthy* that

> the plaintiff has the burden of proving that his speech was a "substantial" or "motivating" factor in the employer's decision to terminate his employment. [*Mount Healthy*, 429 U.S.] at 287 [97 S.Ct. at 576]. The burden then shifts to the employer, who must be given an opportunity to prove that the plaintiff would have been fired even if he had not engaged in the protective conduct. *Id.* The matter of causation is an issue of fact which must be decided by the jury.

*Matulin*, 862 F.2d at 613. Also, "[t]he question of what actually motivated plaintiff's discharge may, of course, be determined by circumstantial evidence." *Conklin v. Lovely*, 834 F.2d 543, 546–47 (6th Cir.1987).

Summary judgment is proper only where the evidence shows that there is no genuine issue as to any material fact. Fed.R.Civ.P. 56(c). All reasonable inferences on disputed factual questions must be drawn in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Historic Preservation Guild of Bay View v. Burnley*, 896 F.2d 985, 993 (6th Cir.1989). As to the first causation inquiry, we cannot say that the evidence is so strong that no reasonable jury could find to the contrary that Langford's speech did not motivate her discharge at least in part. As the district court noted, Lane had dealt with Langford's employment problems by informal arbitration for over a year. Yet immediately after Langford refused to tell Lane what she would say at the public meeting, Lane called a county commissioner to ask if she could fire Langford. Two days after Langford's statements, Lane did in fact fire her. It is thus not implausible that Langford's speech was a substantial factor in Lane's decision. This does not, however, conclude the inquiry.

The Supreme Court explained in *Mount Healthy*,

> A rule of causation which focuses solely on whether protected conduct played a part, "substantial" or otherwise, in a decision not to rehire, could place an employee in a better position as a result of the exercise of constitutionally protected conduct than he would have occupied had he done nothing.... A borderline or marginal candidate ... ought not to be able, by engaging in such conduct, to prevent his employer from assessing his performance record and reaching a decision, not to rehire on the basis of that record, simply because the protected conduct makes the employer more certain of the correctness of its decision.

429 U.S. at 285–86, 97 S.Ct. at 575–76. *Mount Healthy* speaks directly to the present case. Even according Langford the deference due her version of the facts in the context of summary judgment, a reasonable jury could not fail to conclude from the uncontested evidence that Lane, mindful of Langford's past problems, would have fired her even if she had not spoken at the public meeting. As the district court noted, Langford's behavior can only be termed "rank insubordination." In deposition, Langford admitted that she may have told other employees that Lane had "done her dirty." Nor does she deny that she twice refused to discuss her dissatisfaction with Lane, once in front of patients and other employees and in defiance of Lane's warning that she was being insubordinate. Langford had no first amendment right to defy her ultimate superior's request to discuss a pressing work-related problem. Langford further acknowledges that she showed up for work on June 4 as scheduled, but left immediately without attempting to speak to Lane or anyone else when she saw that her time card was still gone from the rack. Obviously, she was looking for a fight, not work.

While we agree with the result reached by the district court and with its logic, we depart from its language only in the observation of the district court that "it seems obvious that the administrator could have fired [Langford] at any time but instead

tried to take the easy way out by arbitrating the various disputes." To the extent this conclusion was based in part on Langford's clashes with her co-workers in late 1986, the record indicates that those problems had been largely resolved or had at least not recurred in the months immediately preceding her termination. Reasonable minds might differ whether Lane's discharge at that point might have been warranted without a resumption of Langford's misconduct. Langford's annual employee evaluation dated March 1987 and the affidavits of two co-workers and a supervisor characterized her work as average or above average and do not disclose any further difficulty until June 1987. Nevertheless, when Langford saw fit not only to reopen old wounds but again directly to challenge her supervisor's authority, in front of other employees, neither Lane nor any other rational employer could have failed to remember the earlier difficulty and have concluded that it was necessary to terminate her at that point. While it is difficult if not impossible to engage in a balancing test where the record fails to disclose the exact nature of communications which Langford made to the public body and which she claims were subject to the protection, still we are satisfied, as was the district judge, that the purely private and employment related conduct of Langford would in all events have led to her discharge.

We remain ever vigilant against restrictions on free expression and view with suspicion any attempts by the government and its employees to chill the right of citizens to speak publicly. Nonetheless, we find ample evidence here that Langford was discharged for insubordination, and agree that no genuine issue of material fact existed from which a reasonable jury could have concluded that she would not have been fired even had she not spoken publicly.

AFFIRMED.

WELLFORD, Circuit Judge, concurring:

While I doubt Langford has effectually presented any infringement of First Amendment claim, I concur in the result reached. There is ample evidence supporting the award of summary judgment that Langford was discharged for insubordination and inability to work cooperatively in the nursing home work environment. I, accordingly, concur in affirming.