87 F.3d 795
 68 Empl. Prac. Dec. P 44,114
 Ila HARTSEL, Plaintiff-Appellant,
v.
Michael B. KEYS, individually and in his capacity as Mayor
of the City of Elyria; the City of Elyria, Ohio;
and the City of Elyria Utilities
Department, Defendants-Appellees.
 No. 94-3693.
 United States Court of Appeals,
Sixth Circuit.
 Argued Aug. 1, 1995.
Decided June 26, 1996.
 
 Ellen Simon Sacks (argued), Michael T. Pearson (briefed), Spangenberg, Shibley, Traci, Lancione & Liber, Cleveland, OH, for Plaintiff-Appellant.
 Stephen J. Gurchik (argued and briefed), Office of the Solicitor, Elyria, OH, for Defendants-Appellees.
 Before: JONES and BOGGS, Circuit Judges; and CHURCHILL, District Judge.*
 BOGGS, Circuit Judge.
 
 
 1
 Ila Hartsel appeals the district court's grant of summary judgment for the defendants, the City of Elyria and the Elyria Utilities Department ("City") and Michael Keys, its mayor. Hartsel's suit arises from her failure to be promoted to Superintendent of the Utilities Department. She alleges discrimination on the basis of gender, in violation of Title VII, 42 U.S.C. § 2000e et seq.; discrimination on the basis of age, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq.; and deprivation of her rights of speech and association under the First and Fourteenth Amendments to the United States Constitution and Article I, § 11 of the Ohio Constitution.
 
 
 2
 The defendants counter that Hartsel was not selected to be Superintendent because the City was about to implement a major computerization of the Utilities Department and that Hartsel had poor computer skills. The district court granted summary judgment for the defendants because Hartsel failed to demonstrate an issue of material fact sufficient to rebut defendants' legitimate, non-discriminatory reason for not promoting Hartsel. Hartsel timely appeals.
 
 
 3
 For the reasons that follow, we find that Hartsel has failed to produce more than a scintilla of evidence supporting her claims under her various theories. Accordingly, we affirm the district court's decision.
 
 
 4
 * Hartsel started working in the Elyria Utilities Department as a clerk-typist in March 1969. In 1977, she was promoted to office supervisor, where she worked under Joe Grace, the utility department's superintendent. Grace held the position of superintendent from 1969 until 1992. In early 1991, Hartsel performed many of the superintendent's duties when Grace missed work due to his wife's illness. Hartsel continued to perform many of these duties in April 1992, when Grace was absent due to his own poor health.
 
 
 5
 In the spring of 1991, Joe Grace's son, Billy, ran against Mayor Keys in a party primary election for mayor. Hartsel publicly supported Billy Grace and assisted the campaign with signs, calling voters, and sat with the Graces at a candidate debate. Keys defeated Grace in the May 1991 primary.
 
 
 6
 In 1992, Hartsel became uncomfortable fulfilling so many of Grace's duties in an unofficial capacity, and in late April 1992, she approached Safety-Service Director Tim Coey to discuss the problem of Grace's prolonged absence. After Coey discussed the issue with Mayor (and defendant) Michael Keys, she was promoted on May 1, 1992, to Acting Superintendent of the Utilities Department. The new position paid Hartsel approximately $13,000 more than her salary as office supervisor.
 
 
 7
 Hartsel claims that, in late 1992, Coey had told her that Keys "was very upset" when he saw her sitting with Bill Grace at a campaign debate; Coey does not remember such a conversation. Joe Grace officially resigned on November 30, 1992, and Hartsel expressed her desire to remain as superintendent permanently, first to Coey, and then to Keys. The mayor indicated that he expected to make a final decision on the appointment around the first of the new year.
 
 
 8
 Tom Brand, a forty-three-year-old deputy auditor in the city's auditing department, also expressed interest in the job. Brand, along with Grace, had played a major role in computerizing the installment department of Elyria's municipal court in 1986. In 1988, Brand had also played a prominent role in computerizing the whole municipal court, which required him to write specifications for the new system and to demonstrate the software to the employees who would use it. Brand had acquired additional computer knowledge by attending adult education classes at night, and he received training from Hewlett-Packard in conjunction with his computerization of the municipal court.
 
 
 9
 Hartsel met with Mayor Keys on December 21, 1992, to discuss the situation. Hartsel alleges that, during the meeting, Keys said three times that he was "99% sure" that he was going to appoint somebody with more computer experience and that he wanted her to stay on "and help the new man" because of her experience and skills. Hartsel interpreted this to mean that she would have to train her replacement, although nobody ever told her as much. Keys and Hartsel also discussed her possible retirement plans.
 
 
 10
 Hartsel claimed that she had heard through the "grapevine rumor mill" over the next few days that Brand was to be promoted to superintendent. During her Christmas vacation, Hartsel stewed over this information, until she concluded that going back to her job as office supervisor and training a less-qualified replacement would be "intolerable." When she returned to work on December 31, 1992, Hartsel submitted a letter of resignation at 9:45 a.m., effective midnight. Keys accepted her resignation at 10:00 a.m., but at 11:40 a.m., he reassigned Hartsel to her prior position as office manager and appointed Brand as Acting Superintendent, effective 11:00 a.m. Keys later justified this decision on the basis that he wanted to maintain a chain of responsibility over the building over the long New Year's weekend, that he was concerned about the abrupt nature of Hartsel's departure, and that Hartsel had returned her keys to the building. Coey was similarly "not thrilled about the idea of having an employee in charge who had after 20 some odd years of service given us a two-hour [sic] notice of resignation."
 
 II
 
 11
 On June 10, 1993, Hartsel sued the City and Keys, claiming that the refusal to promote her to permanent Superintendent constituted a constructive discharge from her job. Defendants moved for summary judgment on January 31, 1994, and plaintiff filed motions and briefs in opposition. On May 27, 1994, the district court granted summary judgment for the defendants, and an appropriate order was entered on May 31, 1994.
 
 
 12
 Judge Aldrich granted summary judgment on the age and sex discrimination claims because Hartsel failed to create an issue of material fact sufficient to rebut defendants' legitimate, non-discriminatory reason for not promoting Hartsel--that "the city sought a new superintendent with computer skills necessary to assist in the upgrade of computers in the Public Utilities Department." The district court noted that Hartsel did not dispute that Brand was more experienced with computers, and "[t]here is nothing illegal about seeking a candidate with the skills necessary to best perform the tasks ahead." Memorandum and Order May 26, 1994, at 17. Indeed, Hartsel's evidence actually supported the defendants' claim that Brand was hired to implement a new computer system--Elyria had purchased an expensive and complex computer and continues to implement the system. The court therefore granted summary judgment, finding that "none of Hartsel's evidence tends to show that the defendant's legitimate reason for its decision is unworthy of belief, or that discrimination was more likely the reason for the decision."[1] Id. at 19.
 
 
 13
 The district court also dismissed Hartsel's § 1983 claim of retaliatory discharge because she had "offered insufficient evidence for this Court to find that her political expression was a 'motivating factor' in the decision not to appoint her." Id. at 20. The district court described the causal connection between the mayoral primary in May 1991 and Keys's decision not to promote Hartsel in December 1992 as "extremely attenuated," particularly in light of his April 1992 decision to make her acting superintendent with a salary increase of $13,000. Hartsel's only evidence of discriminatory motive was Coey's alleged comment that Keys was upset with her, which the court discounted as a "mere scintilla of evidence" that would not prevent summary judgment. Id., at 21.
 
 III
 
 14
 This court reviews de novo the district court's grant of defendants' motion for summary judgment. Baggs v. Eagle-Picher Industries, Inc., 957 F.2d 268, 271 (6th Cir.), cert. denied, 506 U.S. 975, 113 S.Ct. 466, 121 L.Ed.2d 374 (1992). This court must affirm the district court only if it determines that the pleadings, affidavits, and other submissions show "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When evaluating this appeal, this court must view the evidence in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).
 
 
 15
 The moving party need not support its motion with evidence disproving the nonmoving party's claim, but need only " 'show[ ]'--that is, point[ ] out to the district court--that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). The pivotal question is whether the party bearing the burden of proof has presented a jury question as to each element of its case. Id., 477 U.S. at 322, 106 S.Ct. at 2552.
 
 
 16
 The plaintiff must present more than a mere scintilla of evidence in support of her position; the plaintiff must present "evidence on which the jury could reasonably find for the plaintiff." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). Accordingly, hearsay evidence may not be considered on a motion for summary judgment. Wiley v. United States, 20 F.3d 222, 226 (6th Cir.1994). "The 'mere possibility' of a factual dispute is not enough." Mitchell v. Toledo Hosp., 964 F.2d 577, 582 (6th Cir.1992) (quoting Gregg v. Allen-Bradley Co., 801 F.2d 859, 863 (6th Cir.1986)). Accordingly, this standard requires a court to make a preliminary assessment of the evidence, in order to decide whether the plaintiff's evidence concerns a material issue and is more than de minimis.IV
 
 
 17
 As a preliminary matter, we reject plaintiff's suggestion that she was constructively discharged. Hartsel argues that the Mayor's failure to promote her to what she perceives as her rightful position created intolerable work conditions, such that her preemptive resignation the morning of December 31, 1992, was essentially a firing; she offers no other evidence that shows she was driven out of her prior position. If we were to accept this line of reasoning, every person passed over for a purportedly deserved promotion could bring an illegal discharge suit, and the distinction between the two would be erased. Instead, we treat her allegations as a failure to promote claim.
 
 
 18
 Liability in a disparate treatment case depends on whether the protected trait actually motivated the employer's decision. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 252-56, 101 S.Ct. 1089, 1093-95, 67 L.Ed.2d 207 (1981); see Hazen Paper Co. v. Biggins, 507 U.S. 604, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993); Abbott v. Federal Forge, Inc., 912 F.2d 867, 871 (6th Cir.1990). "Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment...." International Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977).
 
 
 19
 Under the now-familiar burden-shifting principle of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), a plaintiff establishes a prima facie case and creates a presumption of discrimination by showing: (1) membership in the protected class; (2) that she suffered adverse employment action; (3) that she was otherwise qualified for the position; and (4) following the plaintiff's rejection, the position was filled by a person outside of the protected class.[2] This general framework applies to both gender and age discrimination, with appropriate modification.
 
 
 20
 Once the prima facie case is made, a defendant may offer any legitimate, non-discriminatory reason for the employment action, which the plaintiff may rebut by evidence of pretext; however, the burden of proof always remains with the plaintiff. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). It is important to note that the defendant need not prove a nondiscriminatory reason for not promoting Hartsel, but need merely articulate a valid rationale. Id. at 514, 113 S.Ct. at 2751.
 
 
 21
 The district court found that Hartsel had satisfied the elements of a prima facie case for both sex and age discrimination, and we need not disturb its conclusion. Thus, the relevant issue is whether the proffered reason for promoting Brand rather than Hartsel was instead a pretext for illegal discrimination. In this case, the defendants claimed that their non-discriminatory reason was that Hartsel lacked the computer skills necessary to lead the upgrading that the department needed. As plaintiff notes, summary judgment is not appropriate every time an employer offers this "business judgment" rationale. "The distinction lies between a poor business decision and a reason manufactured to avoid liability. Thus, facts may exist from which a reasonable jury could conclude that the employer's 'business decision' was so lacking in merit as to call into question its genuineness." Dister v. Continental Group, Inc., 859 F.2d 1108, 1116 (2d Cir.1988).
 
 
 22
 Here, the facts do not at all lack merit, and much of the evidence most damaging to Hartsel's allegations comes from her own testimony. For example, Hartsel claims the defendants inflated the position's qualifications as a facade, designed to keep her from getting the job. In fact, she virtually concedes that she was not qualified for the superintendent's position, as defined by Keys:
 
 
 23
 ... I felt as if I had considerable experience in operating the terminals, turning the computer on and off, when necessary, and I had a lot of experience inputting into the computer on a daily basis.... I knew what I wanted out of the computer and I knew what I wanted put in, which I could explain to the data processing supervisor on what I needed and wanted....
 
 
 24
 Hartsel Dep. at 18. Further, Hartsel admits that the mayor "knew I could not operate the computer, as far as putting the programs on and all this type of thing." This self-assessment is consistent with Coey's characterization of Hartsel's skills:
 
 
 25
 From working with Ila and from working with the department, it is my understanding that computer skills was not her strong point.... We have a data processing supervisor[3] in the department, and Ila ... did not work in that area and had limited knowledge of computer abilities.
 
 
 26
 Hartsel counters with the affidavits of several co-workers that the department functioned well when she was Acting Superintendent. William Fullgrabe, an Engineering Department employee, stated that "Hartsel was doing a good job" and "was well qualified for the Superintendent's position." Mary Grace stated that Hartsel "did a great job," that "I do not believe that it was necessary ... to appoint someone with a data processing background," and that "[g]iven Ila Hartsel's experience in the department and her knowledge of the ordinances, rules and regulations, I believe that she was more qualified than Tom Brand." Tami White, a meter reader who worked in the Utilities Department when the cold prevented outside work on January 18 and 19, 1994, stated that the mail was four days behind under Brand, but "[w]hen Ila Hartsel was Acting Superintendent, the Department rarely got even two days behind on its mail."
 
 
 27
 However, these affidavits miss the point. There is no doubt that Brand and Hartsel have differing strengths and weaknesses, and that Hartsel performed her duties as Office Manager and Acting Superintendent well. The law does not require employers to make perfect decisions, nor forbid them from making decisions that others may disagree with. Rather, employers may not hire, fire, or promote for impermissible, discriminatory reasons. These affidavits reveal perhaps a reasonable difference in opinion, but their bald assertions and conclusory statements fail to provide any factual support for Hartsel's claim of sexist, ageist, or politically retaliatory animus.
 
 
 28
 Hartsel's failure to produce direct evidence of either pretext or discriminatory animus is fatal. There is no testimony that computer skills were not highly desirable for the superintendent's position, and Hartsel only disputes the degree of familiarity needed and argues that the job could have been done by a less expert employee, herself. The evidence supports the defendants' use of computer expertise as a hiring criterion: the city had long been urged to modernize its computer system; shortly after Hartsel resigned, it did so; the previous superintendent, Joe Grace, was much more familiar with computers than Hartsel; and, Brand was much more skilled with the technology than she was. As a result, Hartsel's circumstantial evidence is mere speculation ungrounded in fact, and Keys has demonstrated "an absence of evidence to support the non-moving party's case," as required by Celotex. 477 U.S. at 325, 106 S.Ct. at 2554.
 
 
 29
 To support her claims of discrimination based on gender, Hartsel cites the dearth of female department heads, although Hartsel admits that she does not know how many women applied for department head positions.[4] Ironically, she bases her belief of gender discrimination on her "women's intuition" about "the tone of the whole situation." Hartsel Dep. at 41-44. Although she concedes that Keys never said or did anything to indicate a tone of bias--she claimed that "it is just one of those things that you feel"--she pointed to Keys's "body language" and "vibes." Clearly, Hartsel has failed to proffer sufficient information to put these extremely subjective and vague allegations in logical context, and has therefore failed to exceed the scintilla threshold to prevent summary judgment.
 
 
 30
 Hartsel infers age bias from the injustice of requiring older workers who "didn't grow up with [computers] the way these kids are doing" to compete for promotions against "younger" employees. In a sense, every technological advancement appears to favor the young, but only if one presupposes that older workers are more resistant to change and are adverse to learning new methods; ironically, this is the very type of ageist stereotype that the ADEA was enacted to address. In fact, Brand is forty-three (within the protected class himself and hardly a callow youth), and he states that he also did not grow up with computers, but instead went to adult education classes and sought outside training to become more computer literate. We decline this invitation to hold that requiring computer skills for a promotion is alone sufficient to create a prima facie case of age discrimination.
 
 
 31
 Hartsel relies on several cases, all of which are distinguishable. The plaintiff supported her claim of constructive discharge in Acrey v. American Sheep Industry Ass'n, 981 F.2d 1569, 1573 (10th Cir.1992), with testimony that the employer had told her that she was "too old" and "did not fit the image [the company] wished to project." Significantly, the plaintiff in Acrey was let go because she lacked the ability to use a new accounting system, but she offered evidence that the defendants had intentionally withheld the proper training to create an excuse to fire her. Id. at 1572-73. Likewise, Krause v. Dresser Indus., Inc., 910 F.2d 674, 677 (10th Cir.1990), is inapplicable because, in that case, the plaintiff demonstrated that his employer's proffered reasons were pretextual because the younger employee who was hired acquired the required computer skills only after the plaintiff was fired.
 
 
 32
 In a post-oral argument submission, Hartsel cites the unpublished case of Kline v. TVA, No. 92-5919, 1993 WL 288280 (6th Cir. July 29, 1993), for the proposition that whether, in that case, a "plaintiff was better qualified for the job is a question that should not have been decided in summary judgment proceedings," id. at * 5, is also misplaced. Even accepting as a generality this statement of the specific holding in Kline,[5] the fact remains that there is no question that Brand is more qualified than Hartsel--the parties have practically stipulated to that by their respective testimonies. The relevant factual inquiry is whether computer expertise was a valid job criterion, or if it was a pretense designed to thwart Hartsel's promotion. Since the latter claim is based solely on speculation and hunches, the plaintiff has not created a genuine issue of material fact sufficient to prevent summary judgment.
 
 V
 
 33
 Hartsel's § 1983 claim of retaliatory "discharge" suffers from a similar absence of evidence. Unlike the claims of sex and age discrimination, where the evidence is based entirely on Hartsel's subjective beliefs and intuition, Hartsel has produced some circumstantial evidence that would buttress a claim of politically motivated conduct. However, that evidence consists of a hearsay statement by Coey that Mayor Keys "was very upset" that Hartsel had supported his opponent more than a year earlier, and the district court concluded that this was a mere scintilla which was refuted by the weight of contrary evidence.[6] Hartsel also points to a conclusory affidavit of Joe Grace, which alleges that "[b]ased on my experience and observations of the decisions made by [Keys], I believe [his] decision not to appoint Ila Hartsel permanently to [Superintendent] was politically motivated."
 
 
 34
 Hartsel correctly notes that if a plaintiff produces evidence that her protected expression[7] was a "substantial" or "motivating" factor in a defendant's decision to terminate employment, the burden of proof shifts to the defendant to prove that it would have made the same decision in the absence of the protected conduct. Mount Healthy City Sch. Dist. v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); Matulin v. Village of Lodi, 862 F.2d 609, 613 (6th Cir.1988). Usually, the question of causation is a factual issue to be resolved by a jury, Matulin, 862 F.2d at 613, and may be satisfied by circumstantial evidence. Langford v. Lane, 921 F.2d 677, 683 (6th Cir.1991) (quoting Conklin v. Lovely, 834 F.2d 543, 546-47 (6th Cir.1987)). Nonetheless, a court may grant summary judgment even in a causation inquiry, where it is warranted.[8] Langford, 921 F.2d at 683-84.
 
 
 35
 In this case, Hartsel has not shown that her support of Billy Grace in the May 1991 mayor's race at the debate was a substantial or motivating factor in Keys's decision to select a candidate with computer experience and proficiency, and therefore she has not carried her initial burden of proof. Hartsel's case hinges upon her claim that Coey told her in the fall of 1992 that the mayor was upset that she had supported Billy Grace. Coey does not remember such a remark, although he stated that he could have said it; Mayor Keys denies discussing Hartsel's political activity on Grace's behalf with anybody, and he was unsure whether he was even aware of her involvement. In any event, Hartsel's statement as to the content of Coey's comment must be disregarded, as being inadmissible hearsay. It is a statement being offered for the truth of the matter asserted, i.e., to show that Mayor Keys truly "was very upset" by Hartsel's political activity. Wiley, 20 F.3d at 225-26; Rule 56(e), Fed.R.Civ.P.; State Mut. Life Assur. Co. v. Deer Creek Park, 612 F.2d 259, 264 (6th Cir.1979).
 
 
 36
 Moreover, the chronology of events in this case weakens Hartsel's claim of a grudge by Keys. Mayor Keys promoted Hartsel to acting Superintendent in May 1992, with an attendant raise of $13,000 per year, a year after the primary campaign against Billy Grace. Hartsel points to no actions or statements of Keys that indicate he held any grudge against her in the intervening time. Then, several months later, but before Joe Grace's resignation due to health problems, Coey purportedly told her that the Mayor was very upset with her. A couple of months later, Hartsel is passed over for promotion due to her lack of computer skills. Keys would be a shrewd and extravagant politician indeed to cover his tracks by promoting and rewarding the target of his ire while simultaneously fabricating an alibi premised on computerizing the Utilities Department. The district court appropriately deemed Coey's purported remark as at most a scintilla of evidence incapable of staving off summary judgment.
 
 
 37
 Even if we assume that Hartsel satisfied her threshold requirement of evidence of a substantial or motivating factor, so that the defendants must prove that they would have made the same decision in the absence of Hartsel's protected conduct, we believe that the defendants have met this burden. The decision to value a strong understanding of computers over other possible professional skills is a quintessential example of a business judgment, which must be respected if there is evidence to support its legitimacy. In this case, there is no dispute that the Utilities Department purchased a $165,000 computer system and indeed carried out a computerization program, and that Brand was integral in computerizing two other city departments and had familiarity with the system proposed for implementation. In contrast, Hartsel's cursory knowledge of computers left her dependent upon subordinate personnel, and thus an inappropriate choice to lead an expensive and expansive restructuring of the department's computer system. Hartsel admits that Mayor Keys was aware of her minimal computer skills. Although Hartsel may have been capable of operating a computer system, she has never contended that she personally possessed the skills for supervising such an upgrade. Instead, Hartsel has consistently argued that she could use the computer skills of other employees to achieve the computerization, and that her familiarity with the department's rules and day-to-day operation was more important than computer proficiency.
 
 
 38
 Thus, summary judgment is appropriate where, as in Langford, "a reasonable jury could not fail to conclude from the uncontested evidence that [plaintiff] ... would have fired her even if she had not [engaged in the protected conduct]." 921 F.2d at 683. The district court reached the same conclusion in this case, placing particular emphasis on the timing of Hartsel's endorsement of Keys's opponent and the later dispute. Keys's intervening elevation of Hartsel and concomitant $13,000 raise weaken her claim of a grudge,[9] especially where her accusation is based on an inadmissible single alleged remark by Coey and where the evidence of her lack of qualifications is so overwhelming.
 
 
 39
 We similarly disregard the affidavit of Joe Grace because it consists of subjective allegations and vague, conclusory allegations such as "I have witnessed many decisions made by Mayor Michael Keys regarding appointments, personnel, budgeting, funding and the purchase of new equipment. I believe those decisions ... usually were based on [ ] political considerations." We also note that Grace's affidavit fails to link the purported "political" nature of Mayor Keys's decision-making process to Ila Hartsel's particular grievance, beyond his opinion that Hartsel was "more qualified for the job than Tom Brand." If this document were sufficient to preclude summary judgment, than every employee who failed to support Keys in an election would be able to get any claim of "politically motivated" job discrimination before a jury.
 
 
 40
 Furthermore, a civil servant is not allowed to immunize herself from being fired or denied a promotion by supporting an unpopular cause or losing candidate. As the Supreme Court noted in Doyle, "[a] borderline or marginal candidate ... ought not to be able, by engaging in [protected] conduct, to prevent his employer from assessing his performance record and reaching a decision not to rehire on the basis of that record." 429 U.S. at 286, 97 S.Ct. at 575, quoted in Langford, 921 F.2d at 683.
 
 
 41
 Finally, Hartsel argues that by returning Hartsel to her prior position as office manager before accepting her resignation, Keys acted in a retaliatory fashion. She may be right--Keys might have been angered by her sudden and unexpected resignation--but again, there is no evidence that ties the "demotion" to her protected conduct endorsing Bill Grace almost two years before, or relating Keys's action to Hartsel's gender or age. Nor has Hartsel produced any evidence that this practice is out of the ordinary, or has been applied only to women or Democrats. Significantly, Keys took this step after she resigned, so it can hardly have contributed to her alleged "constructive discharge." Since the evidence is uncontradicted that her role as superintendent was temporary, Keys was not required to calculate her twenty-three years of accrued sick and vacation time at the higher salary she earned for less than a year; doing so would be fiscally irresponsible, costing Elyria additional thousands of dollars[10] without any accompanying municipal benefit, other than Hartsel's goodwill.
 
 VI
 
 42
 Because we hold that the district court properly concluded that the plaintiff failed to show that the defendants' proffered non-discriminatory justifications were pretextual, and because the district court properly concluded that there was no more than a mere scintilla of evidence of politically motivated retaliation, we AFFIRM the district court's grant of summary judgment to the defendants.
 
 
 
 *
 The Honorable James P. Churchill, United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 The district court dismissed Hartsel's so-called "statistical evidence" that only one of Elyria's sixteen department heads is female, because she provided no background facts, such as the number of women in each department, and the sex and qualifications of applicants for the department head positions
 
 
 [2]
 The Supreme Court has recently held that in ADEA suits, the replacement need not be younger than 40, although the difference in age between the plaintiff and the younger replacement may be probative of ageist bias. O'Connor v. Consolidated Coin Caterers Corp., --- U.S. ----, ----, 116 S.Ct. 1307, 1310, 134 L.Ed.2d 433 (1996)
 
 
 [3]
 Mary Grace (apparently no relation to Joe or Billy Grace) had worked with Hartsel as the Utilities Department data processing supervisor. Ms. Grace majored in data processing in acquiring her Associates Degree in Applied Business from Lorain Community College. Ms. Grace opined that it was unnecessary to appoint a person with a data processing background to the superintendent position, in part because "I was available, with years of experience and a degree, to assist Ila Hartsel with any and all computer issues."
 However, the availability of Ms. Grace does not preclude the Mayor from hiring a candidate based on computer proficiency, nor does it transmute a business judgment into a pretext.
 
 
 [4]
 In reality, this is not evidence of discriminatory treatment, but rather, a claim of disparate impact. A disparate impact theory of discrimination exists because "some employment practices, adopted without a deliberately discriminatory motive, may in operation be functionally equivalent to intentional discrimination." Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 987, 108 S.Ct. 2777, 2785, 101 L.Ed.2d 827 (1988). A plaintiff must show for a prima facie case of disparate impact "that a specific employment practice or policy caused a significant disparate impact on a protected group," in this case, women or older workers. Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 656, 109 S.Ct. 2115, 2124, 104 L.Ed.2d 733 (1989). Hartsel identified no practice as causing such impact
 
 
 [5]
 In Kline, the defendant contradicted himself on a material issue: he claimed that he used a draft job description in concluding that the plaintiff was not suited for the position, then twice stated during an EEOC investigation that the job description had been destroyed. Kline, at 4. In contrast, the testimony of Keys and other witnesses consistently supports their claim that computer skills were relevant to the superintendent's job
 
 
 [6]
 In contrast, Brand was active in the state Democratic Party and had supported Keys in 1984 and 1988, performing routine campaign functions and attending some five-to fifteen-dollar-a-plate fundraising dinners
 
 
 [7]
 Hartsel's conduct is protected by the First Amendment because a mayor's election campaign is a matter of public concern, thus satisfying Doyle 's first requirement. Mount Healthy City Sch. Dist. v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977)
 
 
 [8]
 For instance, in Langford, a nursing home employee was fired for insubordination after speaking out against her supervisor at a public meeting. The evidence was undisputed that the employee had repeatedly clashed with co-workers and that two days before the public meeting she had refused to meet with the supervisor to discuss her grievances, which constituted insubordination. Because the court concluded that her supervisor could have fired her at any time, the plaintiff could show no disputed issue of material fact concerning her discharge, and the court granted summary judgment for the defendants
 
 
 [9]
 This circuit has recently endorsed the "same actor inference," which allows an inference of a lack of discriminatory animus where the same person is responsible for both hiring and firing the individual. Buhrmaster v. Overnite Transp. Co., 61 F.3d 461 (6th Cir.1995), cert. denied, --- U.S. ----, 116 S.Ct. 785, 133 L.Ed.2d 736 (1996). This rationale seems applicable to Keys's decision to promote Hartsel temporarily but later find her lacking for the permanent position. It "... hardly makes sense to hire workers from a group one dislikes ... only to fire them once they are on the job." Proud v. Stone, 945 F.2d 796, 797 (4th Cir.1991) (quotation omitted). Likewise, if Keys held a discriminatory animus to Hartsel because she was female, 62 years old, and supported his opponent in the primary, very little had happened to change that bias between the time he promoted her and his choice of Brand less than eight months later. The passage of time between those two events is a relevant factor in weighing the inference, Buhrmaster, 61 F.3d at 464
 
 
 [10]
 Hartsel received $31,972.59 in backpay, based on 1161.98 hours of owed holiday, vacation, and sick time