**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

DOTTIE J. CATHCART,
Plaintiff-Appellee,

v.

FLAGSTAR CORPORATION,

Defendant-Appellant.

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,
Amicus Curiae.

No. 97-1977

Appeal from the United States District Court
for the District of South Carolina, at Spartanburg.
G. Ross Anderson, Jr., District Judge.
(CA-95-370-7-3-AK)

Argued: March 4, 1998

Decided: June 29, 1998

Before HAMILTON and WILLIAMS, Circuit Judges, and
BROADWATER, United States District Judge for the
Northern District of West Virginia, sitting by designation.

_____

Affirmed in part and reversed in part by unpublished opinion. Judge
Hamilton wrote the opinion, in which Judge Broadwater joined. Judge
Williams wrote a separate opinion concurring in part and dissenting
in part.

_____

**COUNSEL**

**ARGUED:** William Carter Younger, MCGUIRE, WOODS, BAT-
TLE & BOOTHE, L.L.P., Richmond, Virginia, for Appellant.

Suzanne Elizabeth Coe, Greenville, South Carolina, for Appellee. Gail S. Coleman, Office of General Counsel, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Amicus Curiae. **ON BRIEF:** M. Christine Klein, MCGUIRE, WOODS, BATTLE & BOOTHE, L.L.P., Richmond, Virginia, for Appellant. Edwin L. Turnage, Travelers Rest, South Carolina, for Appellee. C. Gregory Stewart, General Counsel, J. Ray Terry, Jr., Deputy General Counsel, Vincent J. Blackwood, Acting Associate General Counsel, Carolyn L. Wheeler, Assistant General Counsel, Office of General Counsel, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Amicus Curiae.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

HAMILTON, Circuit Judge:

Flagstar Corporation[1] (Flagstar) appeals the district court's denial of its renewed motion for judgment as a matter of law following a jury verdict in favor of Dottie Cathcart in her action alleging disability discrimination in violation of the Americans with Disabilities Act (ADA), see 42 U.S.C. § 12112. On appeal, Flagstar asserts that because Cathcart successfully claimed to be totally disabled for purposes of Social Security disability benefits, she is judicially estopped from arguing that she is a "qualified individual with a disability" for purposes of asserting a claim of disability discrimination in violation of the ADA. Alternatively, Flagstar argues that the evidence presented at trial was insufficient to support the jury's finding that Cath-

_____

[1] At the time Cathcart was hired, she was hired by Spartan Foods, which was later acquired by Flagstar. Since the time this case was instituted, Flagstar's name has changed again. However, because both parties and all district court documents refer to the defendant/appellant as Flagstar Corporation, we will do the same notwithstanding its name change.

2

cart was discriminated against because of her disability. Although we resolve both issues in favor of Cathcart, we affirm in part and reverse in part the district court's order denying Flagstar's renewed motion for judgment as a matter of law, affirming the denial of Flagstar's motion as to Cathcart's disparate treatment claim and reversing the denial as to Cathcart's reasonable accommodation claim.

I.

Flagstar appeals the district court's denial of its renewed motion for judgment as a matter of law. Therefore, we consider the evidence presented at trial in the light most favorable to Cathcart, the nonmoving party. See DeJarnette v. Corning, Inc., 133 F.3d 293, 297 (4th Cir. 1998); Price v. City of Charlotte, 93 F.3d 1241, 1249 (4th Cir. 1996), cert. denied, 117 S. Ct. 1246 (1997).

Flagstar is a food services company that operates a number of restaurants, including Hardee's, Denny's, and Quincy's. Cathcart began her career with Flagstar on November 22, 1976, when she was hired to perform secretarial jobs and clerical work. Approximately six months after she was hired, in May 1977, Cathcart was promoted to a secretarial position in the Construction Area, where she remained for two years. At approximately the same time that she was promoted, in June 1977, Cathcart was diagnosed with a vision impairment known as "optic atrophy." Optic atrophy is a permanent and degenerative eye condition, affecting visual acuity and causing loss of color vision.

At some time during the two years that Cathcart worked in the Construction Area as a secretary, computers were introduced into the workplace at Flagstar. According to Cathcart, her eye condition made it difficult, if not impossible, to see the computer screen, and in response to the need to begin using computers, Cathcart asked her supervisors whether there was any type of magnification that could be placed on the screen to enable her to see the computer. Cathcart's supervisors responded that they did not know whether there was any such magnification, and Cathcart did not pursue the issue further, thinking that the technology was so new that there may not be any such assistance available.

3

In 1979, Cathcart was transferred to the Human Resources Department in the "Support Center" located at the company's headquarters in Spartanburg, South Carolina. Despite her vision problems, Cathcart performed her job as a personnel assistant in the Human Resources Department well and received consistently positive performance reviews and merit raises. These reviews rated her performance as above satisfactory to outstanding, depending on the year. In addition, there were no disciplinary notations in Cathcart's personnel file at any time.

Toward the end of 1991, Cathcart decided to learn the word processing computer software program WordPerfect to enable her to use a computer in the same manner as her co-workers. To that end, Cathcart asked to be permitted to attend a WordPerfect class. However, when Cathcart went to the class, she had to sit so close to the screen that she was embarrassed and still had difficulty seeing the screen. At that time, she asked whether any magnification was available and was told that it was not.

Shortly thereafter, Cathcart was promoted to Recruiter in the Human Resources Department, where she was responsible for hiring "non-exempt" employees. Judy Brown, Director of Human Resources for the Support Center, promoted Cathcart to the position, in which Cathcart received a salary for the first time, rather than an hourly wage. Cathcart had known Brown since 1980 or 1981, and according to Brown, she had been aware of Cathcart's disability since that time. Although Cathcart expressed concern when she received her promotion that she could not use a computer because of her vision impairment, Brown responded that Cathcart did not need to worry about that deficiency. When Cathcart began her job as a recruiter in March 1992, however, all other employees in the Human Resources Department, with the exception of Cathcart, used a computer.

In approximately October 1992, Flagstar began moving toward the use of electronic mail, or "e-mail." At that time, management employees, including Judy Brown, were given a memorandum stating, "E-mail is here to stay. It is not an option." (J.A. 434). In addition, the memorandum provided that "all distributions" would be sent out via e-mail in the future. (J.A. 433). Every employee in the Support Center was required to have access to e-mail. According to Cathcart,

4

although she could not retrieve e-mail from a computer, she received copies of department e-mails from Brown's administrative assistant.

On January 26, 1993, Cathcart received her most current performance evaluation. Brown completed this evaluation and rated Cathcart's performance as "very good," which required "[w]ell above average performance." (J.A. 429). With respect to Cathcart's communication/human relations skills, Brown gave her an "A" rating, stating, "Dottie has an excellent rapport with everyone she deals with. She handles problem situations very tactfully." (J.A. 430).

In May 1993, Brown was temporarily removed from her position in the Human Resources Department to serve on a Flagstar special project called "Project Best." The project explored ways in which Flagstar could become more technologically advanced, and Flagstar trumpeted these advances in its newsletter announcing the creation of a more technically efficient working environment. While working on Project Best, Brown moved out of her office in the Support Center to a different building. Brown was full-time with Project Best until approximately September 1993.

Several weeks after Brown began working with Project Best, the Human Resources Recruiter in charge of exempt positions, Kent Saad, was removed from the department because of a clash with another employee. Without Brown and Saad, the Human Resources Department was short-staffed, leaving the remaining employees, including Cathcart, to handle many more Human Resources responsibilities than usual. According to Flagstar, Cathcart's performance began to deteriorate during this time period. Brown testified at trial that while she was working on Project Best, she received approximately four voice mail messages from Human Resources Department employees complaining about Cathcart. In addition, Brown testified that she received a number of complaints from other individuals over the six-month period between June and November 1993. One former temporary employee, who had worked at Flagstar just two months, complained to Brown that Cathcart had given her a "mean look" in the break room. (J.A. 297).

Brown's supervisor, Edna Morris, the Executive Vice President for Human Resources at Flagstar, also testified that she received com-

5

plaints about Cathcart and that she passed these complaints along to Brown. According to Morris, these complaints mostly involved allegations that Cathcart was short, and even rude, with certain employees and, as a result, the employees refused to deal with Cathcart.

Cathcart testified at trial that Brown mentioned complaints that had been made about her behavior only one time, in September 1993, when Cathcart was in Brown's office on other business. Brown asked Cathcart to sit down and told her, "I've had some complaints on you." (J.A. 66). When Cathcart asked the identity of the complainants, Brown stated, "I can't tell you that. . . . They've asked me to keep it confidential." Id. Cathcart testified that the need for anonymity did not surprise her because it was generally understood in the department that if anyone had a problem, it was to be kept confidential if they requested confidentiality. However, Cathcart testified that when she asked Brown how many complaints had been communicated about her, Brown "wouldn't look at [her]." Id. Cathcart testified further, "She wouldn't even look me in the eye. She looked down. And I kept saying . . ., `How many, Judy? Do you have one or two or three?'" Id. According to Cathcart, Brown would not look at her and, as if as an afterthought, said, "Well, we've had problems with Melanie Ross. Haven't there been problems with her?" Id. Cathcart testified that Brown never gave her any more names, nor did she tell her how many people had complained. Cathcart then testified that she wrote a general letter of apology addressed, "Dear Flagstar Employee," apparently to be delivered to Ross as a way of apologizing to her while maintaining the confidentiality of the employee's identity. (J.A. 69, 444). In the letter, Cathcart stated:

> I have been made aware that you feel I was not professional as I should have been when you called regarding one of our open positions. I am truly sorry if I have hurt your feelings. It was not my intention to seem uncaring or to be abrupt with you when you called. I take a lot of pride in my job and have always felt I was sensitive to everyone's needs.
>
> Since I can not speak with you, this was the only way I could let you know how I feel. Please accept my apology and I can assure you it will not happen again.

6

(J.A. 444).

In October 1993, Cathcart received a memorandum from Brown's office, stating that every employee was now required to use e-mail. Attached to the memorandum was a sign-up sheet for a training session. Cathcart testified that she attended the session and sat in the third row but could not see the large screen with instructions on how to use e-mail. Cathcart became upset because she could not see the instructions, and when she returned to her department, she called Brown and left a voice mail message stating that she had been unable to see the screen during the e-mail training session and that she needed assistance in receiving and sending e-mail messages. Cathcart testified that when Brown had not responded by the next day, she left a second voice mail message, again requesting assistance with the use of e-mail. However, Cathcart never received a response to her request.

Also in the fall of 1993, Brown and Morris began discussions concerning a possible reorganization of the Human Resources Department. During these discussions, Morris suggested to Brown that employees from other Flagstar departments within the Support Center should work with only one contact person on human resources issues, rather than dealing with different people for different employee relations questions, such as recruiting, hiring, payroll, or insurance. To this end, a new position would be created called a "generalist" position, and the person in that position would be the contact person for certain Flagstar departments, in charge of staffing both non-exempt and exempt positions, working closely with managers on personnel issues, and handling disputes involving employees within the designated departments.

In October 1993, after she had completed her full-time assignment with Project Best, Brown began to implement the ideas she had discussed with Morris concerning the reorganization of her department. In early November 1993, Brown decided to eliminate the two recruiter positions, including Cathcart's, and replace them with two generalist positions. At the time she decided that Cathcart's recruiter position would be eliminated, she also decided that Cathcart would not be hired in one of the new positions as generalist. According to Brown, she and Morris made the decision because the generalist posi-

7

tions involved "a lot of people skills" and Cathcart had shown an inability to adjust to difficult situations when she engendered a number of complaints during Brown's tenure with Project Best. (J.A. 354-55).

Morris testified at trial that when she and Brown made the decision not to hire Cathcart for one of the generalist positions, they discussed Cathcart's eye disability. According to Morris, after she and Brown determined that Cathcart was not the best fit for the redesigned generalist positions, Morris noted that they could find her a position somewhere else in the company, to which Brown responded that Cathcart thought she had a problem using computers and that this impairment might limit her ability to find another position in the company. Morris then told Brown that there was usually some way to help a particular employee if he or she needed assistance. Morris and Brown both testified at trial that Cathcart's vision impairment did not enter into their decision not to place her in either of the newly created generalist positions.

In her deposition testimony, however, Morris stated, in response to the question of whether she believed that the newly created generalist position would involve the use of a computer, "Yes, in my opinion it would have." (J.A. 246). Although, at trial, Morris testified that the ability to use a computer and e-mail was not a requirement for the generalist position, Cathcart's counsel questioned Morris about her earlier deposition testimony that at the time the generalist positions were created she believed the position would involve the use of a computer. In addition, Cathcart introduced the company description of the generalist position. This job description lists numerous skills and behaviors required for the position, including analytical and problem solving skills, integrity, innovation, and interpersonal skills. In addition, under a heading entitled, "Experience/Education Required," the job description states, "Computer literacy is a plus." (J.A. 443).

On December 3, 1993, Brown and Morris met with Cathcart to inform her that her recruiter position was being eliminated and that she would not receive either of the new generalist positions. Brown and Morris informed Cathcart that she would be paid through the end of January 1994 and that during those two months, she would be able to look for another position inside or outside of Flagstar and that she

8

would be provided assistance in identifying available positions within Flagstar.

Several days later, on December 6, 1993, Cathcart met with Marsha Cliff, who was succeeding Brown as Director of Human Resources. Cliff testified that after speaking with Cathcart, she saw no reason to change the decision that Brown and Morris had made concerning Cathcart's employment. Cliff also testified that Cathcart's vision impairment had nothing to do with her decision to concur in Morris and Brown's decision not to place Cathcart in the one of the newly created generalist positions.

Cathcart testified that following her meeting with Morris and Brown and learning about the elimination of her position, she was told to contact Deanna Perkins-Bannister, the Flagstar employee who had previously assisted Cathcart and was hired in one of the new generalist positions, about obtaining a new position within Flagstar. Cathcart testified that she initiated contact with Perkins-Bannister numerous times each week but that Perkins-Bannister returned her call only one time. In addition, despite Perkins-Bannister's promise to mail Cathcart job postings, Cathcart testified that she never received any. Brown testified, however, that during January and February 1994, there were four or five positions available at Flagstar for which Cathcart was qualified. Cathcart interviewed for one of these positions but was not hired.

Sometime after her meeting with Cliff, Cathcart was informed about a computer magnification device called "Zoomtech" that another vision-impaired Flagstar employee used to enable her to see the computer screen. Perkins-Bannister arranged for Cathcart to meet with the vision-impaired employee and to receive a demonstration of Zoomtech. After seeing how the device worked, Cathcart told Perkins-Bannister that she would need access to Zoomtech if she were to get a job working with computers. According to Cathcart, although Flagstar personnel enabled her to see the Zoomtech device, she was never promised that it would be made available to her. Cliff testified that although Flagstar never put in writing or committed in a formal way to providing Cathcart with the Zoomtech technology in the event that she obtained a position requiring the use of a computer, Flagstar intended to provide her with that accommodation if it was required.

9

In addition to arranging for a demonstration of Zoomtech, in January 1994, Flagstar arranged for Cathcart to meet with a representative from the South Carolina School for the Deaf and Blind, who demonstrated other computer equipment used to assist visually impaired individuals.

Between February 1994 and October 1995, Cathcart applied for positions at over sixty-two different companies. In addition to sending her resume, Cathcart visited those employers with human relations or personnel departments to try to get an interview. Nevertheless, none of the companies offered to hire her. At the end of January 1994, after failing to obtain another position within Flagstar, Cathcart was removed from Flagstar's payroll.

On January 4, 1995, Cathcart filed this action in state court in Spartanburg County, South Carolina, alleging that Flagstar discriminated against her because of her age and disability. With respect to her claim of disability discrimination, Cathcart alleged that Flagstar violated the ADA by failing to provide her with a reasonable accommodation for her disability and by terminating her employment because of her disability. See 42 U.S.C. § 12112(a), (b)(5)(A). On February 10, 1995, Flagstar removed the case to the United States District Court for the District of South Carolina.

Three months after filing this suit alleging disability discrimination, Cathcart sought disability benefits from the Social Security Administration (SSA). In her application, Cathcart stated that she became unable to work because of her disability on December 31, 1993, and that she was still disabled. In a handwritten letter, Cathcart stated that when she first became unemployed in December 1993, she believed that she would be able to find other employment. However, in seeking employment, she realized that she could not see well enough to do the work required for the positions available because she could not see to use a computer, to use a cash register, or even to work as a wait-staff person. In ruling on Cathcart's application, the SSA determined that Cathcart did not meet the legal definition for blindness until May 24, 1995, at which time her vision met the legal definition for blindness in both eyes. Because there was insufficient evidence of legal blindness prior to that date, the SSA denied Cathcart benefits between December 1993 and May 1995, but awarded bene-

10

fits beginning in May 1995. The SSA made this determination based on the legal definition of blindness and Cathcart's per se eligibility for benefits because of legal blindness.

On August 16, 1996, Flagstar moved for summary judgment in this action. On September 24, 1996, the parties agreed to dismiss Cathcart's disparate impact age discrimination claim, and on October 29, 1996, a magistrate judge recommended that the district court grant summary judgment in favor of Flagstar on Cathcart's remaining disparate treatment age discrimination claim but deny summary judgment as to Cathcart's disability discrimination claim. The district court accepted the magistrate judge's recommendations on December 24, 1996.

From March 31 to April 2, 1996, Cathcart's claim of disability discrimination was tried to a jury. At the close of Cathcart's case and at the close of all the evidence, Flagstar moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a). These motions were denied. On April 2, 1997, the jury returned a verdict in favor of Cathcart. On the verdict form, the jury found: (1) that Flagstar "failed in its' [sic] duty to make reasonable accommodations for [Cathcart's] disability in violation of the[ADA]"; and (2) that "Cathcart was unjustifiably discharged due to her disability in violation of the [ADA]." The jury then awarded Cathcart back pay and compensatory damages in the amount of $360,000 but declined to award Cathcart punitive damages.

In response, Flagstar filed a renewed motion for judgment as a matter of law, or in the alternative, for a new trial. The district court denied Flagstar's post-judgment motion on June 12, 1997. However, the district court amended the judgment, reducing it from $360,000 to $300,000, to conform to the damages cap imposed by 42 U.S.C. § 1981a(b)(3)(D).

In its order, the district court first held that Cathcart was not judicially estopped from asserting a claim of disability discrimination notwithstanding her assertions to the SSA that she had been disabled and unable to work since December 31, 1993. The district court reasoned that there are fundamental differences between the definitions of disability as used in the ADA and the Social Security Act, precluding the

11

application of judicial estoppel where a claimant asserts that she is disabled for purposes of one act and not the other.

The district court also denied Flagstar's motion for judgment as a matter of law based on insufficiency of the evidence. Specifically, the district court held that Cathcart had produced sufficient evidence from which a reasonable jury could conclude that Flagstar intentionally discriminated against Cathcart on the basis of her disability when making certain adverse employment decisions. With respect to Cathcart's reasonable accommodation claim, the district court held that Cathcart had also produced sufficient evidence from which a reasonable jury could conclude that Flagstar failed to reasonably accommodate Cathcart's disability and that this failure adversely affected her ability to do her job.

Flagstar noted a timely appeal.

II.

Flagstar first argues that the district court erred when it permitted Cathcart to assert that she was a "qualified individual with a disability" and, therefore, entitled to protection under the ADA, despite her earlier representations to the SSA that she was disabled and unable to work beginning in December 1993. Specifically, Flagstar argues that Cathcart should be judicially estopped from asserting in this case that she is capable of performing the essential functions of her job, where she has previously represented to the SSA that she is entitled to disability benefits because her disability prevents her from working. Because the doctrine of judicial estoppel is an equitable doctrine to be applied at the discretion of the district court, we review a district court's decision for abuse of discretion. See Talavera v. School Bd. of Palm Beach County, 129 F.3d 1214, 1220 (11th Cir. 1997); McNemar v. Disney Store, Inc., 91 F.3d 610, 613, 617 (3d Cir. 1996), cert. denied, 117 S. Ct. 958 (1997).

The ADA prohibits discrimination against "a qualified individual with a disability" with respect to "job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A "qualified individual with a

12

disability" is defined as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." Id. § 12111(8). In order to be a member of a protected class under the ADA, then, Cathcart must be able to show that despite her disability, she could have, with or without reasonable accommodation, performed the essential functions of her position with Flagstar. Flagstar argues that because of her statements to the SSA to the effect that she was unable to work, Cathcart should be judicially estopped from arguing that she is capable of performing the essential functions of her position with Flagstar.**2**

Judicial estoppel is an equitable doctrine that precludes a party from adopting a position that is inconsistent with a stance taken in prior litigation. See Lowery v. Stovall, 92 F.3d 219, 223 (4th Cir. 1996), cert. denied, 117 S. Ct. 954 (1997); John S. Clark Co. v. Faggert & Frieden, P.C., 65 F.3d 26, 28 (4th Cir. 1995). The purpose of judicial estoppel is "to prevent the party from `playing fast and loose' with the courts, and to protect the essential integrity of the judicial process." Allen v. Zurich Ins. Co., 667 F.2d 1162, 1167 (4th Cir. 1982). We have previously recognized, however, that "courts must apply the doctrine with caution," and "[t]he `determinative factor' in

_____

**2** In response to Flagstar's argument that the district court abused its discretion in declining to apply judicial estoppel to preclude Cathcart's assertion that she is a qualified individual under the ADA, Cathcart argues that Flagstar waived the affirmative defense of estoppel by failing to raise this defense in its answer. See Fed. R. Civ. P. 8(c) ("In pleading to a preceding pleading, a party shall set forth affirmatively . . . estoppel . . . and any other matter constituting an avoidance or affirmative defense."). Cathcart correctly points out that judicial estoppel was not raised by Flagstar, but rather, sua sponte by the district court. However, Cathcart's waiver argument ignores the fact that judicial estoppel differs from other estoppel defenses in that its purpose, first and foremost, is to "protect the essential integrity of the judicial process," rather than the interests of the opposing party. Allen v. Zurich Ins. Co., 667 F.2d 1162, 1166 (4th Cir. 1982). Because the interests served by the doctrine concern the judicial process more than fairness to the opposing party, it is appropriate for a court to raise the issue sua sponte, where the opposing party fails to raise it, and a party's failure to raise the issue does not foreclose our review.

13

the application of judicial estoppel is whether the party who is alleged to be estopped `intentionally misled the court to gain unfair advantage.'" John S. Clark Co., 65 F.3d at 29 (quoting Tenneco Chems. v. William Burnett & Co., 691 F.2d 658, 665 (4th Cir. 1982)).

In order for a court to apply judicial estoppel to preclude a party from asserting a particular position during litigation, several elements must be met. See Lowery, 92 F.3d at 224. These include: (1) the party sought to be estopped must be seeking to adopt a position that is inconsistent with a stance taken in prior litigation; (2) the prior inconsistent position must have been accepted by the court; and (3) the party sought to be estopped must have intentionally misled the court to gain unfair advantage. See id.

The question, then, is whether the district court abused its discretion in concluding that the requirements for judicial estoppel were not met in this case. We hold that the district court did not abuse its discretion in declining to apply judicial estoppel to preclude Cathcart's assertion that she was a "qualified individual with a disability" because even if Cathcart's assertion to the SSA that she was disabled in December 1993 was somehow inconsistent with her subsequent assertion that she was a "qualified individual with a disability" for purposes of the ADA, the SSA did not accept Cathcart's assertion of disability and, therefore, one of the prerequisites to the application of judicial estoppel was not met.

As set forth above, when Cathcart applied for disability benefits in April 1995, she stated that she became unable to work because of her disabling eye condition on December 31, 1993. In ruling on Cathcart's application, however, the SSA did not accept Cathcart's assertion that she was disabled in December 1993, finding instead that Cathcart did not meet the legal definition for blindness until May 24, 1995. Consequently, the SSA rejected Cathcart's claim for benefits relating to the time period between December 1993 and May 1995.

Because the SSA did not accept Cathcart's assertion that she was unable to work as of December 1993, the second prerequisite for the application of judicial estoppel was not met in this case. Accordingly, the district court did not abuse its discretion in declining to apply the doctrine of judicial estoppel to preclude Cathcart's assertion in this

14

case that at the time her employment was terminated by Flagstar she was a "qualified individual with a disability" for purposes of her ADA claim.

III.

Flagstar next appeals the district court's denial of its renewed motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) on Cathcart's claims of disability discrimination in violation of the ADA. We review a district court's denial of judgment as a matter of law de novo. See DeJarnette, 133 F.3d at 297. A party is entitled to judgment as a matter of law if "there is no legally sufficient evidentiary basis for a reasonable jury to find for [the nonmoving] party on [a particular] issue." Fed. R. Civ. P. 50(a)(1). In reviewing the district court's decision, we must consider the evidence in the light most favorable to the nonmoving party, and we may not weigh the evidence or substitute our judgment of the facts for that of the jury. See DeJarnette, 133 F.3d at 297.

"Discrimination" as used in the ADA prohibits not only disparate treatment because of an employee's disability, see 42 U.S.C. § 12112(a), but also the failure to make "reasonable accommodations to the known physical or mental limitations of . . . an applicant or employee," id. § 12112(b)(5)(A), and "denying employment opportunities to a job applicant or employee," where the denial of the employment opportunity "is based on the need . . . to make reasonable accommodation," id. § 12112(b)(5)(B). See Smith v. Ameritech, 129 F.3d 857, 866 (6th Cir. 1997); Sieberns v. Wal-Mart Stores, Inc., 125 F.3d 1019, 1021-22 (7th Cir. 1997); see also Burch v. Coca-Cola Co., 119 F.3d 305, 314 (5th Cir. 1997) (recognizing that reasonable accommodation claim under ADA differs from wrongful termination claim under ADA), cert. denied, 118 S. Ct. 871 (1998). In this case, Flagstar argues that Cathcart failed to produce sufficient evidence from which a reasonable jury could find either type of unlawful discrimination under the ADA and that the district court, therefore, erred in denying its renewed motion for judgment as a matter of law as to those claims. We address the sufficiency of Cathcart's evidence with respect to each of these claims below.

15

A.

As set forth above, the ADA prohibits employers from discriminating against employees in hiring, firing, advancement, and other terms, conditions, and privileges of employment because of a disability. See 42 U.S.C. § 12112(a). As with other types of disparate treatment claims in an employment discrimination context, a plaintiff may attempt to prove a violation of the ADA with direct evidence, or the plaintiff may attempt to prove her claim with circumstantial evidence by following the proof scheme set forth in McDonnell Douglas Corp. v. Green. See Sieberns, 125 F.3d at 1022; Taylor v. Principal Fin. Group, Inc., 93 F.3d 155, 162 (5th Cir.), cert. denied, 117 S. Ct. 586 (1996). Where an appeal follows a trial on the merits, however, we do not concern ourselves with the specific details of whether a plaintiff has established a prima facie case and the particulars of the burden-shifting proof scheme; rather, we address only the ultimate issue of whether the plaintiff has established discrimination vel non. See DeJarnette, 133 F.3d at 297; Jiminez v. Mary Washington College, 57 F.3d 369, 377 (4th Cir. 1995). Thus, we turn directly to "the factual inquiry of `whether the defendant intentionally discriminated against the plaintiff.'" DeJarnette, 133 F.3d at 297 (quoting Jiminez, 57 F.3d at 377) (internal quotation omitted). In order to prove intentional discrimination, the plaintiff must show both that the reason proffered by the employer for the employment action was false and pretextual, such that discrimination was the real reason for the action. See St. Mary's Honor Center v. Hicks, 509 U.S. 502, 519 (1993) ("It is not enough . . . to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination.") (emphasis in original).

In this case, Flagstar asserts that Cathcart's recruiter position was eliminated and new generalist positions were created to consolidate the responsibility for human resources needs of various Flagstar departments in one individual. Flagstar asserts that the generalist positions required more employee relations skills than the old recruiter position and that, based on the complaints about Cathcart received by Brown and Morris, it was determined that Cathcart was not the "best fit" for the new positions. Thus, according to Flagstar, Cathcart was not denied a generalist position because of her disability, but rather,

16

because of her failure to exhibit good employee relations skills in her recruiter position.[3]

Because Flagstar has articulated a legitimate, nondiscriminatory reason for its decision not to award Cathcart a generalist position, whether the district court erred in denying Flagstar's renewed motion for judgment as a matter of law turns on whether Cathcart has produced sufficient evidence from which a reasonable jury could conclude that Flagstar's articulated reason was a pretext for disability discrimination. In support of its articulated reason for failing to place Cathcart in one of the newly created generalist positions, Flagstar produced two witnesses--Brown and Morris--who testified to having received complaints about Cathcart's behavior toward other Flagstar employees. When pressed at trial, these witnesses named specific individuals who had complained.

Other evidence calls into question the validity of Flagstar's articulated reasons for its decision not to award Cathcart a generalist position, however. First, none of the witnesses specifically named by Brown as having complained about Cathcart testified at trial. Indeed, the only employee who testified at trial was a two-month temporary employee named Teresa Robbins, who complained merely that Cathcart had given her a "mean look" while in the break room. (J.A. 297). Second, according to Cathcart, Brown discussed these complaints with her only one time, and Brown was less than forthcoming about who had complained about what and about how many complaints she had received. Specifically, Cathcart testified that when she asked Brown how many complaints she had received, Brown would not look at her. After pressing Brown further, Cathcart testified that Brown mentioned one employee and asked, "Haven't there been problems with her?" (J.A. 66). Third, the numerous complaints allegedly received about Cathcart's behavior were never documented in any manner. Fourth, for seventeen years, Cathcart received only very favorable evaluations of her performance without any written repri-

_____

[3] We note that Flagstar never defended its decision not to place Cathcart in the generalist position on the basis that Cathcart lacked the computer skills necessary to perform that position. Rather, Flagstar steadfastly asserted, and both Brown and Morris testified, that computer use was not required for the generalist position. (See J.A. 245, 355).

17

mands or a record of complaints. The absence of any documented complaints is particularly significant when considered in light of the fact that Cathcart had served for over two years in the recruiter position, a position that required extensive human relations skills. Indeed, in Cathcart's last performance evaluation, Brown gave Cathcart an "A" rating in communication/human relations skills, stating that Cathcart "ha[d] an excellent rapport with everyone she deal[t] with." (J.A. 430). Fifth, although Flagstar asserts that the elimination of Cathcart's position was due to a department reorganization, of the five members of the Human Resources Department, only Cathcart lost her job as a result of the "reorganization" and only the position Cathcart held--the recruiter position--was eliminated. In addition, the generalist performed many of the same duties Cathcart performed as recruiter.

Because of Cathcart's evidence calling into question the existence or validity of the alleged complaints lodged against her, and the evidence of her previously spotless employment record, a reasonable jury could disbelieve Flagstar's articulated reason for not placing Cathcart in either generalist position. In particular, crediting Cathcart's testimony and version of events, as the jury was free to do, the jury could have reached the conclusion that Brown fabricated the complaints or, alternatively, that while Brown may have received some complaints, she used them as a pretext or an excuse not to place an otherwise competent employee in an available position for which she was qualified. In reaching this conclusion, the jury could have reasoned that a few complaints over an admittedly difficult period in the department would not be sufficient to outweigh the good employment record of a long-term employee. As we have repeatedly recognized, our role in reviewing a denial of a motion for judgment as a matter of law precludes us from "weigh[ing] the evidence, pass[ing] on the credibility of the witnesses, or substitut[ing] our judgment of the facts for that of the jury." Charleston Area Med. Ctr., Inc. v. Blue Cross & Blue Shield, 6 F.3d 243, 248 (4th Cir. 1993); see also DeJarnette, 133 F.3d at 297. In this case, the jury clearly disbelieved Flagstar's explanation that it failed to place Cathcart in one of the generalist positions because she lacked the interpersonal skills necessary for that position, and viewed in the light most favorable to Cathcart, the evidence supports the jury's conclusion.

Having concluded that Cathcart produced sufficient evidence from which a reasonable jury could conclude that Flagstar's articulated rea-

18

son for choosing not to place Cathcart in a generalist position was false, we must now decide whether Cathcart produced sufficient evidence that she was discriminated against because of her disability. Although a close question, we agree that the evidence, when viewed in the light most favorable to Cathcart, was sufficient to support the conclusion that her inability to use a computer because of her vision impairment and, thus, her disability was the motivating factor behind the decision not to place her in one of the generalist positions. This evidence included: (1) memoranda circulated beginning in 1992 stating that Flagstar was moving toward the use of e-mail as the primary method of intra-office communication; (2) evidence that Flagstar, through Project Best and the emphasis on computers as the primary vehicle for communication, was moving inexorably toward increased reliance on computers in the workplace; (3) testimony that Brown, the primary decisionmaker, was actively involved in Project Best and the development of new uses for computer technology to increase Flagstar employees' efficiency and productivity; (4) Cathcart's testimony that in October 1993 she received a memorandum stating that all Human Resources Department employees were required to learn and to use e-mail; (5) Cathcart's testimony that she twice requested assistance from Brown in being able to use e-mail but Brown never responded; (6) Flagstar's job description for the generalist position, providing that computer proficiency was "a plus" under "Education/Experience Required"; and (7) Morris' deposition testimony that in her opinion the generalist positions would involve the use of a computer. From this evidence, the jury could reasonably conclude that Brown and Morris preferred and even required that the persons chosen to fill the generalist positions be able to use a computer; that the significance of computer use at Flagstar had increased dramatically during the two years Cathcart was a recruiter; and that Brown was not responsive to Cathcart's requests for assistance in using e-mail.

While both Brown and Morris testified that Cathcart's inability to use a computer had no impact on their decision not to award her the generalist job, the jury was free to disbelieve their testimony. Flagstar's only other evidence suggesting that Cathcart's inability to use a computer did not impact the employment decision is its evidence that it had provided another visually impaired employee with the magnification technology called "Zoomtech." However, this evidence

19

suggests merely that accommodation for Cathcart's disability was available, not that the particular employment decision at issue was made without respect to Cathcart's impairment. Notably, while Flagstar eventually arranged for Cathcart to see "Zoomtech," Flagstar did not inform Cathcart that "Zoomtech" was available until after the decision not to place her into one of the generalist positions had been affected. Indeed, Brown's testimony suggests that she had already determined not to place Cathcart in one of the generalist positions at the time she became aware that an accommodation for Cathcart's visual impairment might be available. Thus, at the time Brown, the primary decisionmaker, decided not to award Cathcart the generalist job, she was not even aware of Zoomtech.

Flagstar argues, however, that under our decision in Tyndall v. National Educ. Ctrs., Inc., 31 F.3d 209 (4th Cir. 1994), the jury's inference of discriminatory animus on the part of Brown, the primary decisionmaker, was unreasonable. In Tyndall, we recognized in the context of a disability discrimination claim that there is a "powerful inference" of nondiscrimination where the person who makes the adverse employment decision about which the plaintiff complains is also the same person who, within a relatively short time span, hired the plaintiff with knowledge of her disability. See id. at 214-15; see also Mitchell v. Data Gen. Corp., 12 F.3d 1310, 1318 (4th Cir. 1993) (applying presumption in age discrimination case); Proud v. Stone, 945 F.2d 796, 797-98 (4th Cir. 1991) (establishing inference of non-discrimination where hirer and firer are the same). The rationale supporting this inference is that "[f]rom the standpoint of the putative discriminator, `it hardly makes sense to hire workers from a group one dislikes . . ., only to fire them once they are on the job.'" Proud, 945 F.2d at 797 (citation omitted and brackets omitted). Although Cathcart was not hired by Brown, the primary decisionmaker in this case, she was promoted by Brown to recruiter in early 1992 and, therefore, the presumption of nondiscrimination would appear to apply.

However, the evidence in this case suggests that significant changes occurred in the Flagstar workplace between early 1992 and late 1993, when Brown made the decision to eliminate Cathcart's position and not to place her in either of the newly created generalist positions. Specifically, corporate officials at Flagstar had communi-

20

cated their intention to move to e-mail as the primary method of intra-corporate communication, and the company began to develop numerous initiatives aimed at increasing the use of technology in the workplace to enhance employee productivity and efficiency. The most comprehensive initiative, Project Best, drew participants from various departments of Flagstar, and Brown worked exclusively on Project Best for several months, even moving her office to another building. In addition, according to Cathcart, in October 1993 Brown sent a memorandum to all Human Resources Department employees, stating that they must learn to use e-mail. Thus, the corporate environment changed significantly between early 1992 and late 1993, and the change involved a clear move toward greater use of computers in the workplace. From this evidence, the jury could reasonably infer that during this time Brown's attitude toward an employee who, because of a disability, was unable to use a computer might have changed, weakening the presumption of nondiscrimination normally applicable where the hirer and the firer (or the person who promotes and the person who fails to promote) are the same individual. Because of these corporate changes and Brown's central role in making the changes, we do not believe that the inference of nondiscrimination applicable where the hirer and the firer are the same required the jury to conclude that Brown did not discriminate against Cathcart because of her disability.

Particularly in light of Morris' deposition testimony that at the time the generalist positions were created she believed it would involve the use of computers and the substantial evidence that Flagstar was moving inexorably toward increased use of and dependence upon the use of computers in the workplace, a jury could reasonably conclude that Cathcart's inability to use a computer because of her vision impairment impacted Brown and Morris' decision not to place her in one of the generalist positions. In addition, when this evidence is considered in combination with Cathcart's evidence suggesting that the articulated reason for the employment decision was false, a reasonable jury could conclude that Cathcart's inability to use a computer because of her vision impairment was the motivating factor behind the decision not to award her the generalist job.[4] Therefore, we hold that the dis-

_____

**4** Contrary to the dissent's suggestion that we are equating legal blindness with a lack of computer skills and concluding, therefore, that termi-

trict court did not err when it denied Flagstar's renewed motion for judgment as a matter of law as to Cathcart's claim that she suffered an adverse employment action because of her disability.

B.

Flagstar also challenges the district court's failure to grant its renewed motion for judgment as a matter of law as to Cathcart's

_____

nating a legally blind employee for a lack of computer skills is the equivalent of terminating that employee "because of" her disability, we hold that the evidence in this case was sufficient to support the conclusion that Cathcart was not placed in the generalist position because of her physical inability to use a computer. There is little evidence in the record as to whether Flagstar officials blamed Cathcart's inability to use the computer on her physical impairment or, alternatively, on her lack of computer skills. The scarcity of such evidence is not surprising, however, given that Flagstar consistently denied having made the placement decision based on Cathcart's inability to use the computer at all. However, where Cathcart's inability to use the computer is discussed by the decisionmakers--Brown and Morris--it is discussed as being the result of her physical impairment, not the result of a lack of skills. (See J.A. 244, 295). The dissent's contrary conclusion that Cathcart was not placed in the generalist position because she lacked the computer skills necessary to perform the job is not supported by any evidence in the record. To the contrary, this explanation for the decision is one created out of whole cloth by the dissent.

We note further that although Cathcart's computer skills, or lack thereof, were never an issue below, the evidence in the record directly contradicts the dissent's statement that Cathcart"never made a serious effort to acquaint herself with computer technology" during "the seventeen-year course of her employment at Flagstar." Infra, at 26. At least twice, prior to the events of 1993, Cathcart attempted to obtain computer skills. Specifically, as early as 1979, shortly after computers were introduced into the Flagstar workplace, Cathcart asked about possible magnification for the computer. (J.A. 38). Later, in 1991, Cathcart attempted to attend a WordPerfect training session, only to discover that she could not see the screen. She requested magnification but was told that none was available. (J.A. 87-88). The dissent's attempt to fault Cathcart for an alleged failure to obtain computer skills serves only to deflect the focus from the lack of any evidence supporting the dissent's conclusion that it was Cathcart's lack of computer skills, rather than her visual impairment, that motivated the decisionmakers in this case.

22

claim that Flagstar failed to reasonably accommodate Cathcart's disability in violation of 42 U.S.C. § 12112(b)(5). As discussed above, § 12112(b)(5) prohibits: (1) not making reasonable accommodations to known impairments of an applicant or employee, unless such accommodation would impose an undue hardship, see id. § 12112(b)(5)(A); and (2) denying employment opportunities to a job applicant or employee, where such denial is based on the need to make reasonable accommodation, see id. § 12112(b)(5)(B). Although it is somewhat unclear, Cathcart appears to rely on Flagstar's failure to place her in a generalist position as a violation of the second type of reasonable accommodation claim set forth in § 12112(b)(5)(B). Thus, in order to withstand Flagstar's renewed motion for judgment as a matter of law as to her reasonable accommodation claim, Cathcart must show that she was denied an employment opportunity--in this case, a generalist position--not only because of her disability, but specifically because of Flagstar's need to reasonably accommodate Cathcart's disability. See id.

Although, as discussed above, we hold that Cathcart has produced sufficient evidence from which a jury could reasonably infer that she was denied a generalist position because of her inability to use a computer, we do not believe that Cathcart has produced sufficient evidence that she was denied a generalist position specifically because Flagstar did not want to reasonably accommodate that disability. According to Brown's undisputed testimony with respect to her decision not to place Cathcart in one of the generalist positions, she first decided not to place Cathcart in a generalist position in early November when she and Morris had a meeting to discuss the changes to take place in her department. Morris testified that after they had discussed the new positions and decided that Cathcart would not be placed in one of the newly created generalist positions, Morris told Brown that she felt confident that they could place Cathcart in another position within the company. Brown responded that Cathcart had a visual impairment that might hinder Cathcart's ability to be placed in a position involving the use of a computer, and Morris explained to Brown that she believed, based on her experience with Flagstar, that there would be a way to accommodate Cathcart's disability. This evidence suggests that at the time Brown decided not to place Cathcart in a generalist position, she was not aware of any available accommodation to enable Cathcart to use a computer. While Brown and Morris

23

subsequently discussed the possibility of having to accommodate Cathcart's disability, they did so only after deciding that Cathcart would not be placed in one of the generalist positions. There simply is insufficient evidence in the record that the need to accommodate Cathcart's disability, in particular, was the motivating factor behind Brown's decision not to place her in a generalist position. Therefore, we agree with Flagstar that the district court erred when it denied Flagstar's renewed motion for judgment as a matter of law as to Cathcart's reasonable accommodation claim.

IV.

In conclusion, we hold that the district court did not abuse its discretion in declining to apply the doctrine of judicial estoppel to preclude Cathcart's assertion that she was a "qualified individual with a disability" for purposes of the ADA, notwithstanding her previous assertions of disability for purposes of the Social Security Act. With respect to Flagstar's renewed motion for judgment as a matter of law as to Cathcart's claims of disability discrimination in violation of the ADA, we hold that the district court erred in denying that motion as to Cathcart's reasonable accommodation claim but did not err in denying that motion as to Cathcart's claim of disparate treatment because of her disability. Therefore, we affirm in part and reverse in part the district court's order denying Flagstar's renewed motion for judgment as a matter of law. Because we hold that Cathcart produced sufficient evidence from which a reasonable jury could conclude that she was discriminated against in violation of the ADA, however, remand is unnecessary, and the district court's judgment in favor of Cathcart on her disability discrimination claim stands.

AFFIRMED IN PART, REVERSED IN PART

WILLIAMS, Circuit Judge, concurring in part and dissenting in part:

Although I agree with Parts I, II, and III.B of the opinion, I respectfully dissent from Part III.A. A close reading of the majority's analysis leads to the conclusion that Cathcart was not "otherwise qualified" for the generalist position. Therefore, Cathcart cannot qualify for the protection of the ADA as a matter of law. Additionally, the majority errs when it equates evidence that Cathcart was terminated for lack

24

of computer skills with evidence that she was terminated because of her disability. As a result, I would remand this case back to the district court with instructions to enter judgment in favor of Flagstar.

I.

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual." 42 U.S.C.A. § 12112(a) (West 1995). As a result, to show a violation of the Act, Cathcart must demonstrate that: (1) she has a disability; (2) she is otherwise qualified; and (3) she was terminated because of her disability. See Tyndall v. National Educ. Ctrs., Inc., 31 F.3d 209, 212 (1994). There is no question that Cathcart has a disability. Her condition, optic atrophy, has left her legally blind. The majority's analysis, however, has convinced me that Cathcart does not meet the final two criteria -- qualification for the position and discrimination because of disability.

A.

Under the ADA, only individuals who are qualified for the job they seek may state a claim for discrimination. The ADA defines "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C.A. § 12111(8). A qualified person must be "able to meet all of a program's requirements in spite of his handicap." Southeastern Community College v. Davis , 442 U.S. 397, 406 (1979). Consequently, to prove that she was qualified for the generalist position Cathcart must produce evidence that: (1) she could "`perform the essential functions of the job, i.e., functions that bear more than a marginal relationship to the job at issue,'" or (2) if not, whether "`any reasonable accommodation by the employer would enable [her] to perform those functions.'" Tyndall, 31 F.3d at 213 (quoting Chandler v. City of Dallas, 2 F.3d 1385, 1393-94 (5th Cir. 1993)).

As the majority correctly notes, circumstances had changed at Flagstar during the seventeen years that Cathcart was employed:

25

> [C]orporate officials at Flagstar had communicated their intention to move to e-mail as the primary method of intra-corporate communication, and the company began to develop numerous initiatives aimed at increasing the use of technology in the workplace to enhance employee productivity and efficiency.

Ante at 20-21. Further, the majority concludes that Cathcart's supervisors "required that the persons chosen to fill the generalist positions be able to use a computer."[1]Ante at 19. The only logical conclusion to be drawn from the majority's accurate factual assessment is that computer use was an "essential function" of the generalist position. Cathcart's lack of computer skills is undisputed.

The evidence presented during trial showed that during the seventeen-year course of her employment at Flagstar, Cathcart never made a serious effort to acquaint herself with computer technology.[2] She also never sought an accommodation that would enable her to use a computer. Although Zoomtech[3] was readily available, that program would not be sufficient to cure all of her computer related deficiency. Zoomtech could help Cathcart read the computer screen, but it could not provide computer training. The majority concedes as much when it agrees that the jury verdict finding liability on Cathcart's failure to accommodate claim under 42 U.S.C.A. § 12112(b)(5)(B), was not supported by the evidence presented at trial.

_____

[1] During trial the question of whether the generalist position required computer use was hotly contested. Deanna Perkins Bannister, a woman who filled one of the generalist positions after Cathcart was terminated, testified that it would be possible to perform the functions of the generalist position without the use of a computer.
[2] There was neither an allegation in the complaint nor evidence presented at trial that Flagstar had discriminatorily prevented Cathcart from obtaining adequate computer training throughout the course of her employment.
[3] Zoomtech is a software package that enables those with vision impairments to read the computer monitor. The features of the computer program are not fully discussed in the record. It is apparent, however, that the program enlarges the size of the letters on the screen.

26

Therefore, based upon the majority's conclusions that computer skills were an essential part of the human resources generalist position and that Flagstar did not fail to accomodate her, I believe that Cathcart was not a "qualified individual with a disability." Thus, her ADA claim must fail as a matter of law.

B.

An additional flaw in the majority's analysis is that it equates evidence that Cathcart was terminated because she lacked computer skills with evidence that she was terminated because of her disability. Because I believe that "legally blind" and "has computer skills" are not mutually exclusive categories, I cannot countenance the majority's determination that evidence that Cathcart was terminated for her lack of computer skills is legally sufficient proof that she was terminated because of her disability.

The majority cites seven items of evidence in support of its conclusion that sufficient evidence was presented at trial such that a reasonable jury could conclude that Cathcart was terminated because of her disability. All of the evidence relied upon by the majority, however, directly relates to Cathcart's lack of computer skills: (1) memoranda circulated beginning in 1992 stating that Flagstar would be using e-mail as its primary means of intra-office communication; (2) Flagstar's increasing emphasis on computer use throughout the corporation as indicated by the importance of Project Best; (3) Brown, Cathcart's former supervisor, was on the Project Best committee and was heavily involved in computerizing Flagstar; (4) Cathcart's testimony that she and the other members of the human resource department received a memorandum stating that everyone in the department must learn to use e-mail; (5) Cathcart's testimony that she left phone messages requesting assistance from Brown regarding use of e-mail on two occasions but Brown did not respond; (6) the job description for the human resources generalist position provided that computer proficiency was a plus; and (7) Morris' deposition testimony that the generalist position would require computer use. See ante at 19. Unless one makes the inferential leap that having computer skills and being legally blind are mutually exclusive categories, none of this evidence implicates Cathcart's disability. Cathcart did not produce sufficient

27

evidence of a causal link between her termination and her disability so that such an inference is reasonable.

"Federal courts do not sit as a super-personnel department that reexamines an entity's business decisions," Harvey v. Anheuser-Busch, Inc., 38 F.3d 968, 973 (8th Cir. 1994) (internal quotation marks omitted), and the law does not require employers to make wise decisions regarding which employees it will retain and which it will terminate at times of corporate downsizing or reorganization, see Hartsel v. Keys, 87 F.3d 795, 801 (6th Cir. 1996), cert. denied, 117 S. Ct. 683 (1997). Rather, the law mandates only that employment decisions be made on non-discriminatory bases. See id.; Faulkner v. Super Valu Stores, Inc., 3 F.3d 1419, 1434 (10th Cir. 1993). Thus, evidence that a corporation made a decision to terminate a seventeen-year employee with a good employment history is not itself legally actionable. Firing a long-term employee is only actionable if it occurs under circumstances that indicate a violation of one of several statutes enacted to prevent discrimination in the workplace. See, e.g., Age Discrimination in Employment Act of 1967, 29 U.S.C.A. §§ 621-634 (West 1985 & Supp. 1998) (prohibiting age discrimination); Rehabilitation Act, 29 U.S.C.A. §§ 701-797 (West 1985 & Supp. 1998) (prohibiting discrimination because of disability by federally funded entities); Civil Rights Act of 1964 (Title VII), 42 U.S.C.A. §§ 2000e - 2000e-17 (West 1994) (prohibiting discrimination on the basis of race, color, religion, sex, or national origin); Pregnancy Discrimination Act, 42 U.S.C.A. § 2000e(k) (West 1994) (incorporating pregnancy discrimination into Title VII's definition of discrimination because of sex); Americans with Disabilities Act of 1990, 42 U.S.C.A. §§ 12101-12213 (West 1995) (prohibiting discrimination against individuals with disabilities).

The ADA does not protect an individual from termination because she lacks computer skills. Lack of computer skills is a recognized legitimate, non-discriminatory reason for termination, see Christopher v. Adam's Mark Hotels, 137 F.3d 1069, 1072 (8th Cir. 1998) (holding that employee with bipolar disorder terminated because she lacked computer skills was dismissed for a legitimate nondiscriminatory reason under ADA); cf. Miller v. Butcher Distris. , 89 F.3d 265, 267-68 (5th Cir. 1996) (holding that fifty-seven year old woman did not state a claim under the ADEA because she was dismissed for lack of com-

28

puter skills); <u>Hartsel</u>, 87 F.3d at 800-802 (holding that employer's decision to place a man with more computer experience in a position was not violative of either Title VII or ADEA), and Cathcart's lack of computer skills is undisputed.

Further, there is no evidence in the record demonstrating any connection between the emphasis on computers in the new generalist position and any desire by any individual at Flagstar to prevent Cathcart from holding that position because of her disability. Rather, as the majority notes, Flagstar had made a corporate decision to reorganize in a manner that emphasized technology as a route to efficiency. A corporate decision to emphasize computers affects all levels of the company, including the human resources department. During trial there was never any evidence presented that Flagstar's decision to computerize was in any way designed to dislodge disabled employees generally or Cathcart specifically. Nor is such a conclusion a reasonable inference that could be drawn from the evidence presented.

The majority's rationale rests upon an equation of legal blindness with lack of computer skills. This assumption simply does not hold water. Many legally blind individuals obtain computer skills and are able to be productive additions to a high-technology based environment. <u>See, e.g.</u>, Stacy J. Willis, <u>High-Tech Training Opens New Vistas: Foundation Links the Blind with Computers and Careers</u>, Ariz. Republic, May 21, 1997, at EV 8, <u>available in</u> , 1997 WL 8365030 (noting that computer training has opened up career avenues for the blind). In fact, as demonstrated during trial, Flagstar had at least one legally blind individual in its workforce who had the requisite computer skills to perform an entirely computer-based job through the use of Zoomtech computer software.

Because no evidence was presented indicating that Cathcart was terminated because of her disability, Flagstar's renewed motion for judgment as a matter of law should have been granted.

II.

In summary, the evidence presented at trial demonstrates only that Cathcart was terminated because she lacked the requisite computer skills to continue her job in the reorganized Flagstar human resources

29

department. No evidence was presented indicating that her disability played a role in her termination, or that she was the victim of discriminatory animus because of her disability. As a result, no reasonable jury could conclude based on the evidence presented that Cathcart was terminated because she was legally blind. Therefore, I would remand this case to the district court with instructions to enter judgment in favor of Flagstar.