**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name: 06a0570n.06**
**Filed: August 9, 2006**

**No. 05-1557**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| PINAKI MAZUMDER, PH.D., | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| UNIVERSITY OF MICHIGAN; | ) | EASTERN DISTRICT OF MICHIGAN |
| UNIVERSITY OF MICHIGAN COLLEGE | ) | |
| OF ENGINEERING; DEAN STEPHEN | ) | |
| DIRECTOR; INTERIM CHAIRMAN | ) | |
| RICHARD BROWN; PRAMOD | ) | |
| KHARGONEKAR, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

Before: MARTIN and SUTTON, Circuit Judges; JORDAN, District Judge.[*]

PER CURIAM. Pinaki Mazumder, a professor of engineering, claims that the University of Michigan, its department of engineering and several of his superiors violated federal and state law by discriminating against him in the terms of his employment and in addressing several incidents involving his current and former students. The district court granted summary judgment for the University and the other defendants on all of Mazumder's broad-ranging accusations in two very well-reasoned opinions. We agree with the judgment of the district court and we write here only to

---

[*] The Honorable R. Leon Jordan, United States District Judge for the Eastern District of Tennessee, sitting by designation.

second its opinion and to address several arguments on which Mazumder particularly focuses in his pro se appeal.

I.

Mazumder joined the faculty of the College of Engineering at the University of Michigan in 1987. He claims that during his years as a professor in the college of engineering he experienced repeated discrimination by the administration, including the following: being passed over for promotions, receiving average and below average salary increases and being victimized by the mishandling of student evaluation improprieties, among others. At the same time, Mazumder indicates that during his time at Michigan he became a very prominent professor and received several offers for chaired positions at other schools.

In January 2001, one of Mazumder's graduate students, Mayukh Bhattacharya, left the University of Michigan for a job with the Avant! Corporation. Before leaving, he went to the University's department computing office to obtain copies of certain of his files, which were stored on Mazumder's computer. Mazumder alleges that nearly 54,000 files were copied from his computer. He reported the alleged theft and the University began an investigation. Jack Bernard, in the University's general counsel's office, wrote several letters to Bhattacharya informing him that the University had "eyewitness and electronic evidence" that he had "copied and/or removed an extensive number of electronic files" containing "research work conducted (within the scope of employment) by [Bhattacharya] and others," "proprietary information made available to the

University under non-disclosure agreements," "software tools developed within the Mazumder lab," "software licensed exclusively for University use," and "copyrighted works belonging . . . to the University of Michigan, Dr. Mazumder, and other researchers." JA 364. The letters went on to inform Bhattacharya that the copying could subject him to "criminal or civil penalties" and requested that he, among other things, "destroy any and all additional copies of files you removed from the University." *Id*. The third letter sent by Bernard informed Bhattacharya that if he did not respond by August 20, 2001, the University would "contact federal and state authorities." JA 366.

Bhattacharya eventually contacted the University. He denied all wrongdoing and sent a list of the files that he copied from Mazumder's computer, totaling nine files. Bernard further investigated the allegations and concluded that Mazumder was mistaken about the extent of the copying. The head of the computing lab, Donald Winsor, said that it was impossible to determine which files were actually copied. He clarified that he had never told Mazumder that Bhattacharya copied 54,000 files, but had told him that was the number of files in the accessed directories. Bernard concluded that it would have been "extremely unlikely that [Bhattacharya could copy so many files] without leaving a trace record." JA 604. Winsor stated that he had seen no evidence that Bhattacharya had "done anything beyond what's normal for a graduating graduate student" to copy. JA 1409. While Mazumder alleges that his files were used improperly by Bhattacharya and his employer, he admits that he has no evidence of such use.

Before Bernard released his final report on the incident, Bhattacharya and several other of Mazumder's former graduate students made complaints against their professor alleging that he

"required them to use University resources for commercial purposes; to access personal information; and to pay professional expenses out of their own pockets." D. Ct. Op. at 4. The students also alleged that Mazumder "treated them disrespectfully" and that they heard the professor "make stereotypical remarks about the students' race and country of origin." *Id*. at 4–5. Stephen Director, Dean of the School of Engineering, stated that he considered the students' claims to be "serious charges" and that on January 31, 2002, he appointed an ad hoc committee "in order to provide [Mazumder] with an opportunity to discuss them and have due process." JA 1360. Mazumder alleges that the ad hoc committee was formed because his attorney criticized Bernard's final report on the file-copying incident for containing "intentional errors, distortions of facts and mischaracterizations." Mazumder Br. at 13 (emphasis omitted). He further complains that the ad hoc committee procedure had never been used in the College of Engineering's 125-year history and that it was "prejudicial" and "indelibly stigmatizing." *Id*. at 27. The committee held a hearing on April 16, 2002, but eventually disbanded without issuing a final report.

On February 12, 2002, Mazumder filed a grievance with the University, protesting the handling of the file-copying incident and the ad hoc committee investigation as well as other past run-ins with the university. On January 6, 2003, the University's grievance review board concluded that the ad hoc committee procedure was irregular and should not be repeated. *See* JA 188 ("The [grievance review board] strongly believes that the existing 'Ad Hoc Hearing Procedure' should not be used in an investigative process as it fails to separate investigative and adjudicative functions."). The procedure "has not previously been used in the College of Engineering, nor has its use been

officially considered by the College Rules Committee and approved by the faculty of the College of Engineering as required by College governance procedures." JA 187. The review board recommended that in the future, the College of Engineering use a procedure that was approved by the College Rules Committee—"Procedures for Investigating Allegations of Misconduct in the Pursuit of Scholarship and Research" ("Procedures")—which appropriately separates investigation from possible adjudication. JA 188. As per the "Procedures," the review board recommended that the College "undertake efforts, as appropriate and feasible, to restore the reputation[] of [the] person[] alleged to have engaged in misconduct" because the allegations were not validated. *Id.* On March 12, 2003, the University informed Mazumder that it would disseminate a letter in an effort to restore Mazumder's reputation. Mazumder indicated to the University that a letter would not be sufficient and requested attorney's fees and other damages. The University declined and never sent a letter.

While this grievance was ongoing, on April 24, 2002, Mazumder filed a complaint of discrimination with the University's equity and diversity office on the basis of his "caste," immigration status, race and religion. The office investigated the complaint and determined that no discrimination was evident. The report was forwarded to a review committee established by the University, which also concluded that no discrimination was evident. On November 11, 2002, Mazumder filed a complaint with the Equal Employment Opportunity Commission, which determined that it would neither seek to reconcile the parties nor sue on Mazumder's behalf and on

January 10, 2003, issued Mazumder a letter indicating he had the right to pursue a civil remedy on his own.

Finally, on April 8, 2003, Mazumder filed suit under Title VII against the University, the College of Engineering, Director (the dean of the College), Richard Brown (the interim chairman of the electrical engineering program) and Pramod Khargonekar (the former chairman), charging them with discrimination based on race, national origin, caste and religion and for retaliation for Mazumder's complaints about the discrimination. The professor also brought several Michigan state law claims. On May 27, 2004, the district court granted Khargonekar summary judgment on all claims based largely on admissions by Mazumder that all of the Title VII claims and most of the state law claims against Khargonekar should be dismissed. On March 28, 2005, the Court granted summary judgment to the defendants on Mazumder's remaining federal and state claims. The court noted that for each of the claims, Mazumder had failed to establish at least one element of his *McDonnell Douglas* prima facie case or had failed to rebut the University's legitimate non-discriminatory rationale for the adverse employment action. Mazumder appeals, focusing primarily on the facts outlined above. *See* Mazumder Rep. Br. at 1 ("Appellee's emphasis on salary disparity diverts from the focus of the lawsuit, namely, the [ad hoc committee] investigation and the file copying incident[.]") (capitalization removed).

For the record, we do not interpret Mazumder's appeal to be limited to his claims based on the file-copying incident and the ad hoc committee investigation. However, while we review a grant of summary judgment de novo, *see DePiero v. City of Macedonia*, 180 F.3d 770, 776 (6th Cir.

1999), we are satisfied that the district court appropriately granted summary judgment to the defendants on Mazumder's claims about inadequate salary increases, *see* D. Ct. Op. at 18–27, the handling of his course evaluations, *see id*. at 27–9, his retaliation claims, *see id*. (JA 97–101), and the state claims raised in this litigation. Mazumder does not meaningfully rebut the district court's rationale for these conclusions in the brief attention he pays to them on appeal. The district court's analyses of Mazumder's allegations involving the file-copying incident and the ad hoc committee investigation are persuasive as well, but we will address these claims in slightly more detail due to the extent of Mazumder's briefing on these issues.

## II.

Under Title VII of the Civil Rights Act of 1964, Pub. L. 88-352, § 704, 78 Stat. 257, as amended, 42 U.S.C. § 2000e *et seq*., "[a] plaintiff may establish a prima facie case of discrimination either by presenting direct evidence of intentional discrimination by the defendant or by showing the existence of circumstantial evidence which creates an inference of discrimination." *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1246 (6th Cir. 1995) (citations omitted). Mazumder does not assert any compelling evidence of direct discrimination and he accepts the district court's application of the familiar burden-shifting framework used to establish indirect evidence of discrimination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Under the framework, Mazumder first must establish a prima facie case of discrimination, which requires him to show that "1) he was a member of a protected class; 2) he was subject to an adverse employment action; 3) he was qualified for the job; and 4) for the same or similar conduct, he was treated

differently from similarly situated non-minority employees." *Perry v. McGinnis*, 209 F.3d 597, 601 (6th Cir. 2000). If Mazumder can establish a prima facie case of discrimination, the burden shifts to the defendants to present a legitimate, non-discriminatory reason for the action. *Hartsel v. Keys*, 87 F.3d 795, 800 (6th Cir. 1996). If they do so, the burden shifts back to Mazumder to demonstrate that the proffered reason was not the real reason for the action but rather a pretext for discrimination. *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1083 (6th Cir. 1994). Regardless of this shifting burden of production, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). "[B]ald assertions and conclusory statements fail to provide any factual support" and will not serve to carry this burden of persuasion. *Hartsel*, 87 F.3d at 801.

A.

In addressing the file-copying incident, the district court concluded that Mazumder had "failed to demonstrate that [it] was materially adverse to him." D. Ct. Op. at 34. An adverse employment action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *White v. Burlington Northern & Santa Fe Ry.*, 364 F.3d 789, 798 (6th Cir. 2004) (en banc) (quoting *Burlington Indus. v. Ellerth*, 524 U.S. 742, 761 (1998), *aff'd*, 126 S. Ct. 2405 (2006)). Importantly, this standard filters out claims establishing merely a "bruised ego." *Id.* at 802.

Despite Mazumder's detailed retelling of the file-copying incident in his brief, it is somewhat difficult for us to find anything factually that supports the professor's charges that he was subjected to an "adverse employment action." Allegedly allowing Bhattacharya to make the copies in the first place simply could not constitute such an action. There is no evidence that any files about which Mazumder is concerned were in fact copied, but more importantly there is no evidence that if the copying did happen, it affected Mazumder's conditions of employment in any material manner. Mazumder makes extensive assertions about the money that he could have lost from sales that he might have made of proprietary technology. But as mentioned, he admits there is no actual evidence that the copying of these files impacted those potential sales or any other benefit of his employment.

With regard to the conclusions of the investigation, Mazumder faces a similar problem. Bernard looked into Mazumder's claims in a manner that even the professor conceded was a "thorough investigation." Mazumder Br. at 7. The counsel threatened Bhattacharya with significant legal action until the post-doctorate student made an accounting of the files that he took from Mazumder's drive. Bernard's investigation involved "many months gathering information," and he concluded that he was "unable to identify a specific instance of infringement" and in fact "some of [the] allegations were based on erroneous information." JA 604. Mazumder criticizes the report for a variety of reasons, but never proffers any evidence that Bernard's report was materially wrong. He states that Bernard was wrong that the files Bhattacharya took "fit on one 3.5" disk," JA 605, because the evidence suggests Bhattacharya used a CD to store the data. However, Mazumder simply misreads the report which is making a point about the size of the files, not the actual method

of transfer. Either way, in view of the lack of evidence that the files were misused, we fail to see how the report alone could constitute an adverse employment action because Mazumder admittedly suffered no material change in his employment as a result.

Mazumder does argue that the report led to the formation of the "adjudicative [ad hoc committee] review." Mazumder Br. at 12 (emphasis removed). However, this is a mischaracterization of the actual chain of events that Mazumder alleges led to the formation of the ad hoc committee. Mazumder actually alleges that in response to his lawyer's letter criticizing the report, the College of Engineering "established an unprecedented, adjudicative Hearing procedure to discipline [Mazumder]." *Id.* at 13 (emphasis removed). Retaliation against Mazumder's criticism is a different concern (that the district court addressed) than the implied position that the University was "disciplin[ing]" the professor because Bernard's report found that there was no harm done with regard to the file-copying incident. As a result, we agree with the district court that Mazumder failed to demonstrate that the file-copying incident resulted in an adverse employment action. And even if there was some lingering concern, Mazumder presents no evidence that the University treated this incident any differently than it treated any other such accusation made by a non-minority professor.

B.

Turning to the ad hoc proceeding itself, there are two possible ways that Mazumder claims the College of Engineering discriminated against him. One possible claim is that by investigating

him, regardless of how, the University discriminated against him. The second is that the University discriminated by using the ad hoc committee to investigate him, instead of the approved "Procedures" method. The district court resolved both claims on the ground that Mazumder did not adequately demonstrate that other similarly situated non-minority professors were treated differently. We will address the scenarios separately.

With regard to the former scenario, that the University discriminated by investigating the student's claims, regardless of method, the district court was correct in its resolution. Mazumder does not identify any other similarly situated non-minority whom the university did not investigate. Mazumder does identify several professors whom the university defended when post-doctorate students and graduate students brought a civil suit against them. However, the situations do not appear, in fact, to be similar. First, Mazumder does not claim that the University did not first complete an investigation of the professors in question before choosing to represent them against the legal claims of their former students. Second, no evidence indicates that had Bhattacharya and the other students sued Mazumder, instead of simply complaining to the University, that the University would not have defended him in a like manner. Mazumder also points to a "white" professor who "was allowed to leave the University of Michigan quietly and join [another university] without having to face any adjudicative hearing even though egregious charges were brought against him by some students." Mazumder Br. at 38 (emphasis removed). However, Mazumder gives no details of the charges brought, the professor's situation, why he was allowed to leave or whether an investigation (as opposed to an adjudicative hearing) was made into the

charges before he was released. Mazumder thus fails to carry his prima facie burden to demonstrate that similarly situated non-minorities were treated differently with regard to whether investigating at all was discriminatory.

Even if we did conclude that Mazumder had met his burden, he would have difficulty rebutting the University's non-discriminatory rationale—namely that the allegations brought by the students were serious and deserved investigation. To establish that a reason for an adverse action was pretextual and thus defeat summary judgment, Mazumder "must show one of the following: (1) that the proffered reason had no basis in fact, (2) that the proffered reason did not actually motivate the action, or (3) that the proffered reason[ was] insufficient to motivate the action." *Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 589 (6th Cir. 2002) (internal quotation marks and brackets omitted). In this case, solid evidence supports the claim that the students' allegations were brought against Mazumder, so the proffered reason for the investigation certainly had a basis in fact. With regard to motivation, Mazumder alleges that Director appointed the committee to investigate him because he was criticizing Bernard's report on the file-copying incident. But the Supreme Court has concluded that even if the proffered reason did not motivate the action, the secret motive still must be discriminatory to defeat summary judgment. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) ("[A] reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason."); *see also id*. at 519; *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 417 (7th Cir. 2006) ("If [the proffered reason] is not the true ground, the employer may still be innocent of discrimination; he may for example have

lied to conceal a reason that was discreditable but not discriminatory.") (citations omitted). Here, Mazumder himself argues repeatedly that his letter criticizing Bernard's report for "intentional errors, distortions of facts, and mischaracterizations" was the real reason "Director formed an adjudicative [ad hoc committee] investigation." Mazumder Br. at 13 (emphasis removed). Mazumder never even alleges that he was investigated as a result of discrimination and certainly provides no evidence establishing discrimination as the actual or even partial motivation behind the investigation. As a result, Mazumder fails to provide any evidence upon which a fact finder might conclude that the University discriminated against him by investigating the students' claims.

The University's method of investigating Mazumder also was not an adverse employment action. Once separated from the fact of being investigated, the choice of the manner of investigation does not constitute a significant change in employment status or an action causing a significant change in employment benefits. The University is quick to note that Mazumder remained a full professor throughout this entire period and that no changes were made to his workload or salary as a result of these incidents. Mazumder responds that the investigation, and specifically the method, harmed his reputation, and led to his missing out on more lucrative jobs at other universities.

We need not determine whether harm to reputation, as it affects other employment opportunities, can constitute an adverse employment action. *Cf. Holcomb v. Powell*, 433 F.3d 889, 902 (D.C. Cir. 2006) ("Although purely subjective injuries, such as dissatisfaction with a reassignment, public humiliation, or loss of reputation, are not adverse actions, the threshold is met when an employee experiences materially adverse consequences affecting the terms, conditions, or

privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm.") (internal quotation marks omitted). In this case, there is no evidence that the choice of the ad hoc committee, as opposed to the investigation itself, had any effect on Mazumder's reputation. While the plaintiff certainly makes that claim, the only admissible evidence that he provides to substantiate it is the report of the grievance review board. Yet a reading of that report does not support his claim. Although the grievance board's report concluded that the ad hoc committee procedure was inappropriate, it did not conclude that there was any evidence that Mazumder suffered harm to his employment status or benefits as a result. Even if Mazumder had suffered an adverse action, there is no evidence to rebut Director's honest belief that the ad hoc committee afforded Mazumder the due process protections necessary. Rather, Mazumder merely bases his complaints on the findings of the grievance review board and bare assertions of Director's ill will based on Mazumder's critique of the University's handling of the file-copying incident. Even if Mazumder is right about Director's motivation, he fails to demonstrate that his motive was discriminatory.

III.

For these reasons, we affirm.